UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GARY D. ARONSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 11-11492-NMG |
| ADVANCED CELL TECHNOLOGY, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| and | ) | |
| | ) | |
| JOHN S. GORTON, AS TRUSTEE OF THE JOHN S. GORTON SEPARATE PROPERTY TRUST, DATED 3/3/1993, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 11-11515-NMG |
| ADVANCED CELL TECHNOLOGY, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION
ON DEFENDANTS' MOTIONS TO DISMISS**

July 16, 2012

DEIN, U.S.M.J.

## I.  INTRODUCTION

These consolidated actions arise out of Warrants to Purchase Securities (the

"Warrant Agreements"), which the defendant, Advanced Cell Technology, Inc. ("ACT"),

issued to the plaintiffs, Gary D. Aronson ("Aronson") and John S. Gorton, as Trustee of

the John S. Gorton Separate Property Trust, Dated 3/3/1993 ("Gorton").  Under the

Warrant Agreements, the plaintiffs were entitled to purchase shares of ACT stock at a set

price, and also were entitled to certain adjustments in the share price and number of

shares they would receive in the event ACT issued, or agreed to issue, lower priced

shares to a third party during the time period known as the Pricing Period.  In both of

these actions, the plaintiffs claim that ACT, with the assistance of its former Chairman

and Chief Executive Officer, William MacKay Caldwell ("Caldwell"), violated the

company's obligations under the Warrant Agreements by concealing the occurrence of

two transactions in which ACT agreed to sell stock to third parties during the Pricing

Period at prices which allegedly should have triggered adjustments to the plaintiffs'

shares.  They further allege that as a result of ACT's and Caldwell's misleading

statements and omissions regarding the two transactions, Aronson and Gorton purchased

ACT stock at inflated prices and received fewer shares than they should have received

under the terms of their Warrant Agreements.

By their First Amended Complaints, the plaintiffs have asserted claims against

ACT for securities fraud pursuant to section 10(b) of the Securities and Exchange Act of

1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, as

well as for breach of contract.  Additionally, the plaintiffs have asserted securities claims

against the defendant, Wilmington Trust, N.A. ("Wilmington Trust"), as Special

Administrator of the Estate of William MacKay Caldwell.  By those claims, the plaintiffs

are seeking to hold Wilmington Trust liable, pursuant to section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), based on Caldwell's former status as an alleged control person of ACT.

The matter is presently before the court on the defendants' motions to dismiss (Docket Nos. 13, 19, 37 and 38)[1] the plaintiffs' First Amended Complaints.  By their motions, the defendants contend that dismissal is warranted because the plaintiffs have failed to state a plausible claim for relief under Fed. R. Civ. P. 12(b)(6), and because the claims asserted against them under the Exchange Act are untimely and fail to comply with the heightened pleading standards required under Fed. R. Civ. P. 9(b) and the Private Securities Litigations Reform Act, 15 U.S.C. § 78u-4(b).  As detailed herein, this court finds that Aronson and Gorton have failed to state a claim for violations of the federal securities laws, and recommends that Counts I and II of the plaintiffs' First Amended Complaints be dismissed with prejudice.  This court also concludes that the plaintiffs' allegations are sufficient at this stage in the litigation to state a claim against ACT for breach of contract relating to ACT's issuance of a warrant to William Woodward.  Therefore, and for all the reasons described below, this court recommends to

---

[1]  Each defendant has filed a separate motion to dismiss in each of the two consolidated cases.  Unless otherwise indicated, citations to documents contained in the record refer to documents filed in the Aronson matter, Civil Action No. 11-11492-NMG.  Because the defendants' motions to dismiss in the Aronson matter are identical to the motions filed in the Gorton matter, and because each of the defendants has incorporated by reference the arguments made by the other defendant in its brief, this court finds it most expeditious to address all of the motions together in a single Report and Recommendation.

the District Judge to whom this case is assigned that Wilmington Trust's motions to dismiss (Docket Nos. 13, 37) be ALLOWED and that ACT's motions to dismiss be ALLOWED IN PART and DENIED IN PART, in accordance with this decision.

## II.  STANDARD OF REVIEW OF RECORD

### A.  Motion to Dismiss Standard of Review

"In considering a motion to dismiss, a court must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiffs." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).  In doing so, the court may consider documents attached to or expressly incorporated into the Complaint, as well as "documents the authenticity of which are not disputed by the parties," "official public records," "documents central to the plaintiffs' claim," and "documents sufficiently referred to in the complaint" without converting the motion into one for summary judgment.  Id. at 3-4 and cases cited.[2]  The court may grant dismissal only if the Plaintiffs

---

[2]  In addition to the exhibits attached to and incorporated into the plaintiffs' complaints, the parties have submitted various exhibits which may properly be considered in connection with the defendants' motions to dismiss.  A full set of ACT's exhibits relating to both its motion to dismiss the Aronson complaint and its motion to dismiss the Gorton complaint is attached to its Memorandum of Law in Support of Motion to Dismiss and its Reply Memorandum in Support of its Motion to Dismiss in the Aronson case (Docket Nos. 20 & 29), and will be cited as "ACT Ex."  A full set of Wilmington Trust's exhibits, filed in support of its motions to dismiss in both the Aronson and Gorton matters, is attached to the Declaration of Ai Tajima filed in the Aronson case (Docket No. 15), and will be cited as "WT Ex."  Additionally, a complete copy of the exhibits filed by the plaintiffs in support of their oppositions to the defendants' motions to dismiss can be found in the Request for Judicial Notice attached to Aronson's Opposition to Advanced Cell Technology's Motion to Dismiss (Docket No. 25-1), and will be cited as "Pl. Ex."  In accordance with this court's separately issued Memorandum of Decision and Order on Plaintiff's Motion for Leave to File Supplemental Request for Judicial Notice, this court will not consider the complaint filed against ACT in the matter of SEC v. Mark A. Lefkowitz, et al.

have failed to allege "a plausible entitlement to relief."  Bell Atl. Corp. v. Twombly, 550

U.S. 544, 559, 127 S. Ct. 1955, 1967, 167 L. Ed. 2d 929 (2007).  Accordingly, "the

complaint must include 'factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged.'"  SEC v. Tambone, 597

F.3d 436, 442 (1st Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct.

1937, 1949, 173 L. Ed. 2d 868 (2009)).  "If the factual allegations in the complaint are

too meager, vague, or conclusory to remove the possibility of relief from the realm of

mere conjecture, the complaint is open to dismissal."  Id.

### B.    PSLRA Heightened Pleading Requirements

In 1995, Congress enacted the Private Securities Litigation Reform Act

("PSLRA"), 15 U.S.C. § 78u-4, which marked an effort to curb abuse in private

securities lawsuits.  See Greebel v. FTP Software, Inc., 194 F.3d 185, 191 (1st Cir. 1999).

The PSLRA established strict pleading standards for such lawsuits, which are consistent

with the First Circuit's preexisting standards for pleading securities fraud under Fed. R.

Civ. P. 9(b).  See id. at 193.  The statute requires that a complaint claiming securities

fraud based on misstatements or omissions set forth "each statement alleged to have been

misleading, the reason or reasons why the statement is misleading, and, if an allegation

regarding the statement or omission is made on information and belief, the complaint

shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-

4(b)(1).  Additionally, where a plaintiff's cause of action requires proof that a defendant

acted with a particular state of mind, the PSLRA requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "The 'required state of mind' for liability under section 10(b) [of the Exchange Act] and Rule 10b-5 is referred to as scienter, which the Supreme Court has defined as 'a mental state embracing intent to deceive, manipulate, or defraud.'" Greebel, 194 F.3d at 194 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 1381 n.12, 47 L. Ed. 2d 668 (1976)). Therefore, under the PSLRA, the complaint must "state with particularity facts that give rise to a 'strong inference' of scienter rather than merely a reasonable inference." In re Cabletron Sys., Inc., 311 F.3d 11, 28 (1st Cir. 2002).

Although the pleading requirements in private securities fraud cases are strict, "they do not change the standard of review for a motion to dismiss." Aldridge v. A.T. Cross Corp., 284 F.3d 72, 78 (1st Cir. 2002). Accordingly, the following facts are viewed in the light most favorable to the plaintiffs.

### III.  STATEMENT OF FACTS

### The Parties

Defendant ACT is an early-stage biotechnology company that is incorporated in Delaware and has a principal place of business in Marlborough, Massachusetts. (Compl. ¶ 5).[3] Its common stock is registered with the Securities and Exchange Commission

---

[3] The plaintiffs' First Amended Complaints are nearly identical. Therefore, as a general matter, this court has cited only to Aronson's First Amended Complaint (Docket No. 4)

("SEC"), and its shares are traded under the symbol "ACTC."  (Id.).  Prior to his death in

December 2010, Caldwell served as the Chairman and Chief Executive Officer of ACT.

(Id. ¶ 7).  Allegedly, Caldwell also claimed to fill the roles of the company's Chief

Operating Officer, Chief Administrative Officer and Chief Financial Officer, and he was

responsible for issuing ACT stock during all times relevant to the present action.  (Id. ¶¶

6-7).  Defendant Wilmington Trust is the Administrator of Caldwell's estate.  (Id. ¶ 6).

Plaintiff Aronson is a citizen of Nevada, and an investor in early stage start-up

biotechnology companies.  (Id. ¶ 4).  He has owned shares of ACT common stock for

over six years.  (Id.).  Plaintiff Gorton is a citizen of California.  (G. Compl. ¶ 4).  Like

Aronson, Gorton is a shareholder of ACT.  (Id.).

## The Warrant Agreements

The Warrant Agreements at the center of this case arose out of a legal dispute that

began in 2004, when Aronson and Gorton brought a collection action against ACT's

predecessors and two of their officers in the Worcester Superior Court.  (See Compl. ¶

12).  Following a year of litigation, during which time ACT's predecessors allegedly

violated or sought to avoid the state court's orders, the parties reached a settlement, which

was memorialized in a Settlement Agreement dated September 14, 2005.  (Id. ¶¶ 12-24).

Aronson, Gorton, ACT and Caldwell all were parties to the Settlement Agreement.  (See

---

("Compl.") and to the documents attached to that Complaint ("Compl., Ex. _").  To the extent it
is necessary to cite Gorton's First Amended Complaint (Docket No. 4 in C.A. No. 11-11515-
NMG), it shall be cited as "G. Compl. ¶ __."  Documents attached to Gorton's First Amended
Complaint shall be cited as "G. Compl., Ex.__".

Compl., Ex. A at p.1).  Pursuant to the terms of that Agreement, ACT was required to

issue a Warrant to Purchase Shares ("Warrant Agreement") to each of the plaintiffs.  (See

Compl. ¶ 25; Compl. Ex. A ¶ 2(c)).  Accordingly, ACT executed Warrant Agreements on

September 14, 2005 and delivered them to the plaintiffs.  (See Comp., Ex. B at pp. 8-9; G.

Compl., Ex. B at 7-8).

Pursuant to Aronson's Warrant Agreement, Aronson had the initial right to

purchase, at any time through January 15, 2009, 375,756 shares of ACT common stock at

a price of $2.20 per share (the "Warrant Purchase Price").  (Compl. ¶ 26; Compl., Ex. B

at pp. 1-2).  Similarly, under his Warrant Agreement, Gorton was granted the initial right

to purchase, at any time through January 15, 2009, 46,970 shares of ACT common stock

at the Warrant Purchase Price of $2.20 per share.  (G. Compl. ¶ 26; G. Compl., Ex. B at

pp. 1-2).  Additionally, the plaintiffs were entitled to automatic adjustments in the number

and purchase price of their shares in the event ACT issued or agreed to issue lower priced

shares to a third party during the time period between May 1, 2005 and January 15, 2009

(the "Pricing Period").  (See Compl., Ex. B at p. 2 and ¶¶ 3, 3.1).  As detailed below, the

plaintiffs allege that during the Pricing Period, ACT issued lower priced shares to two

different individuals, but took steps to conceal those transactions from the plaintiffs in

order to avoid making the necessary adjustments.

Section 3 of the Warrant Agreements governed the circumstances under which

adjustments were to be made  before the plaintiffs exercised their purchase rights.

Specifically, the relevant portions of Section 3 provide:

3.     ADJUSTMENT OF WARRANT PURCHASE PRICE
AND NUMBER OF SHARES.  The Warrant Purchase Price
shall be subject to decrease and the number of shares
purchasable upon the exercise of this Warrant shall be subject
to increase from time to time upon the occurrence of certain
events and/or price determinations described in this Section 3.
Upon each decrease of the Warrant Purchase Price per share
of Common Stock, if any, the Holder of this Warrant shall
thereafter be entitled to purchase, at the Warrant Purchase
Price resulting from such adjustment, the number of Equity
Units[4] obtained by multiplying the Warrant Purchase Price
per share of Common Stock in effect immediately prior to
such adjustment by the number of shares purchasable
pursuant hereto immediately prior to such adjustment, and
dividing the product thereof by the Warrant Purchase Price
per share of Common Stock resulting from such adjustment.

3.1     Issues of Equity Securities.  If and whenever during the
Pricing Period, [ACT] shall issue or agree to issue any Equity
Units or other securities, other than Excluded Units (as
defined below),[5] for a consideration per share or providing for
a conversion or an exercise price per share which is less than
the Warrant Purchase Price in effect immediately prior to
such issue, the Warrant Purchase Price shall be reduced to the
per-share price applicable to such issuance.  The fair market
value of each such share and security of which an Equity Unit
is comprised shall be determined by [ACT's] Board of

---

[4]  The term "Equity Unit" is defined in the Warrant Agreements to include "Common
Stock or Preferred Stock, either alone or issued, offered or sold together as an integrated
investment unit with any warrants or similar non-debt securities convertible or exchangeable,
directly or indirectly into Common Stock or Preferred Stock."  (Compl. ¶ 28; Compl., Ex. B at p.
1).

[5]  The Warrant Agreements define "Excluded Units" as "shares of Common Stock or
options therefore issued to, exercised or purchased by directors, officers, employees or
consultants of [ACT] in connection with their service as directors of [ACT], their employment
by [ACT] or their retention as consultants of [ACT], in each case authorized by the Board of
Directors and issued pursuant to [ACT's] 2004 Stock Option Plans and 2005 Stock Incentive
Plans or any other such option plan approved by vote of a majority of the independent members
of the Board of Directors of [ACT]."  (Compl. ¶ 27; Compl., Ex. B ¶ 3.1(2)).

> Directors in good faith; provided, that the Holders may appeal
> any such determination to an Arbitrator as provided for
> herein.  Each such adjustment of the Warrant Purchase Price
> shall be calculated to the nearest one tenth of a cent....

(Compl. ¶ 27; Compl., Ex. B ¶¶ 3, 3.1).  Accordingly, if before the plaintiffs exercised their warrants ACT issued or agreed to issue any Equity Units or other securities at a price below $2.20 per share during the Pricing Period, the price at which the plaintiffs could exercise their stock purchase rights would decrease, and the number of purchasable shares would increase.

The Warrant Agreements also provided for adjustments to be made after the plaintiffs exercised some or all of their purchase rights:

> If, at any time (and on each time) between May 1, 2005 and
> January 15, 2009 (the "Pricing Period"), after the exercise of
> any or all of the Warrants hereunder, [ACT] issues any Equity
> Units other than Excluded Units (as defined below), and the
> effective per share purchase price of Common Stock
> represented by such Equity Units (the "Effective Price") being
> issued is lower than the Warrant Purchase Price paid in
> connection with such prior exercise, then [ACT] shall issue to
> the Holder sufficient additional Equity Units (of the same
> security(ies) that was (were) previously issued to the Holder
> upon the previous exercise of the Warrant) such that the total
> number of Equity Units issued to the Holder equals the
> number determined by multiplying [the number of shares
> which the Holder is initially entitled to purchase] by a
> fraction, the numerator of which is $2.20 and the denominator
> of which is the Effective Price, as the same may be amended.

(Compl. ¶ 30; Compl., Ex. B at p. 2).  Thus, even after the plaintiffs exercised their rights to purchase shares, ACT was required to give them the best terms that it made available to other investors who received ACT stock during the Pricing Period.  (See Compl. ¶¶ 31-

32).

Other relevant provisions of the Warrant Agreements required ACT to notify Aronson and Gorton whenever it issued any Equity Units or other securities to third parties upon terms that triggered the plaintiffs' right to an adjustment, and provided for equitable relief in the form a decree for specific performance or an injunction prohibiting violations of the Warrant Agreements in the event ACT failed to comply with any of its obligations thereunder.  (Id. ¶¶ 29, 33).  Moreover, under the parties' Settlement Agreement, ACT agreed to pay any attorney's fees and costs incurred by the plaintiffs in connection with the enforcement of the Warrant Agreements.  (Id. ¶ 34).  By its claims in this action, Aronson and Gorton are seeking injunctive relief and attorney's fees, in addition to damages, as a result of ACT's alleged failure to comply with the terms of the Warrant Agreements.  (Id. ¶¶ 100-03).

### ACT's Alleged Failure to Disclose the Engstrom Warrant

The plaintiffs challenge a warrant issued to the company's former Chief Financial Officer, Gunnar Engstrom (the "Engstrom Warrant").  (Id. ¶ 52).  Pursuant to the Warrant, Engstrom was entitled to purchase, at any time during the period from April 1, 2005 through April 1, 2010, 100,000 shares of ACT common stock at a price of $0.25 per share.  (Id. ¶¶ 52, 60; Compl., Ex. M at p. 2).  The issue before this court is whether, as the defendants contend, the Engstrom Warrant was issued before the Pricing Period or if, as the plaintiffs claim, it was issued on May 9, 2005 during the Pricing Period.  For the reasons detailed below, this court finds that the Engstrom Warrant was issued before the

11

Pricing Period and that, therefore, the claims relating to the Engstrom Warrant should be dismissed.

The record reveals that the Engstrom Warrant was issued in connection with a January 30, 2005 settlement agreement between ACT and Engstrom, under which ACT was required to grant Engstrom options to purchase ACT stock.  (See Compl., Ex. L).  As the relevant language of the settlement agreement provided:

> ACT shall grant to Engstrom, options to purchase One Hundred Thousand (100,000) shares of ACT common stock. The options shall have a strike price of twenty-five cents ($0.25) per share and a cash-less exercise feature and shall have a term of five (5) years.  ACT will forward a stock option agreement to Engstrom, within 15 days of the date of execution of this agreement.  <u>Said agreement will [be] negotiated and executed no later than March 1, 2005, and shall be effective as of April 1, 2005.  The executed option agreement shall be held in escrow by counsel for Engstrom until April 1, 2005, the date to which Engstrom has agreed to comply with the terms and conditions of paragraph 4 of this agreement</u>[6]....

(ACT Ex. 1 at Exhibit 10.53 ¶ 1) (emphasis added).  Accordingly, the parties to the settlement contemplated that the Engstrom Warrant would be released from escrow and go into effect by April 1, 2005, one month prior to the start of the Pricing Period.

In fact, the evidence demonstrates that the Engstrom Warrant memorializing Engstrom's option to purchase ACT shares was executed on April 1, 2005, but was not

---

[6]  Pursuant to paragraph 4 of the settlement agreement, Engstrom was required to assist ACT, through April 1, 2005, with certain matters relating to the identification and transfer of data concerning the finances and operation of the company, and to return certain documents, information and materials to ACT that remained in his possession.  (See ACT Ex. 1 at Exhibit 10.53 ¶ 4).

delivered to Engstrom until April 29, 2005, still before the Pricing Period.  (See Compl.,

Ex. L; Compl., Ex. M at pp. 1, 7).  Nevertheless, because the Warrant was exercisable

beginning on April 1, 2005, the record indicates that Engstrom could have exercised his

purchase rights thereunder before the Pricing Period began on May 1, 2005.  (See Compl.

¶ 60 (SEC Annual Report for Fiscal Year ended December 31, 2005 reports that these

"warrants are exercisable on or after April 1, 2005 and lapse if unexercised on April 1,

2010.")).

    As alleged by the plaintiffs, ACT subsequently "backdated" the Engstrom Warrant

to November 30, 2004 and sent a revised copy of it to Engstrom on May 9, 2005.[7]  Thus,

on May 3, 2005, two days after the Pricing Period had begun, one of ACT's executive

officers, James Stewart, sent an email to the company's outside counsel, Christopher

Howard, informing him that due to a previously unresolved issue relating to taxes, ACT

was "still holding the warrant agreement related to our settlement with Gunnar

[Engstrom]."  (Compl, Ex. L).  In a reply dated May 5, 2005, Attorney Howard informed

Mr. Stewart that the Engstrom Warrant needed to be re-dated from April 1, 2005 to

November 30, 2004.  (Id.).  According to Attorney Howard, the re-dating was necessary

in order to reflect the date of Engstrom's termination from the company and to conform to

---

[7] Although the plaintiffs use the term "backdating" there is no allegation that the date
change was illegal, or that ACT engaged in fraudulent backdating by "[i]ntentionally employing
hindsight to adjust the grant date to an advantageously low price."  In re CNET Networks, Inc.,
483 F. Supp.2d 947, 955 (N.D. Cal. 2007).  See also New Mexico State Investment Council v.
Ernst & Young, LLP, 641 F.3d 1089, 1096 (9th Cir. 2011).  The period in which Engstrom could
exercise his warrant remained unchanged despite the amended date of the warrant.

ACT's Equity Tracking Matrix.  (Id.).  Consequently, Mr. Stewart instructed another

employee to send the Warrant to Attorney Howard so he could "replace the warrant to

conform to [the] equity tracking tool."  (Id.).

On or about May 9, 2005, Attorney Howard sent Engstrom a letter enclosing a

copy of the Warrant with the original execution date of April 1, 2005 crossed out and the

new date of November 30, 2004 inserted above the parties' signature lines.  (Compl., Ex.

M at p. 7).  In his cover letter accompanying the Warrant, Attorney Howard provided the

following instructions:

> Enclosed for your execution is a revised Warrant.  This
> Warrant is the same in all respects to the Warrant which you
> previously executed, with the exception of the date.  The
> revised Warrant is dated November 30, 2004, the date of your
> termination.  Please sign this Warrant and return a copy of the
> fully executed Warrant to me in the enclosed, self-addressed,
> stamped envelope.  I would also appreciate it if you would
> return the incorrect warrant which you received on April 29,
> 2005.

(Compl., Ex. M at p.1).  Based on these facts, the plaintiffs contend that the warrant was

issued on May 9, 2005.


### ACT's Public Disclosures of the Engstrom Warrant

The record reveals that ACT disclosed the Engstrom Warrant in its publicly filed

Form 10-QSB for the period ended March 31, 2005.[8]   Therein, ACT stated that on

---

[8]  The record does not indicate when ACT filed its Form 10-QSB with the SEC.
However, it is clear from the circumstances concerning the Engstrom Warrant that the filing was

November 30, 2004, it had granted warrants to purchase 100,000 shares of ACT common stock at a price of $0.25 per share.  (ACT Ex. 1 at p.12).  It also revealed that the warrants were exercisable during the period from April 1, 2005 to April 1, 2010, and that they were granted in connection with the termination of an employment contract.  (Id.).  A copy of the Engstrom Warrant, as well as a copy of the settlement agreement between ACT and Engstrom were attached to the company's Form 10-QSB.  (Id. at attachments).   The Warrant contained the revised execution date of November 30, 2004.  (Id.).

ACT disclosed the Engstrom Warrant again in its Form 10-KSB for the fiscal year ended December 31, 2005.  (Compl. ¶¶ 59-60).  Although ACT did not identify Engstrom by name, it revealed that on November 30, 2004, it had granted warrants to a former executive of the company which entitled the former executive to purchase 100,000 shares of common stock at a price of $0.25 per share.  (Id. ¶ 60).  It further disclosed that the warrants were exercisable on April 1, 2005, and would lapse if not exercised by April 1, 2010.  (Id.).  The plaintiffs claim that ACT's public disclosures regarding the details of the Engstrom Warrant were misleading because they concealed the fact that the Warrant was issued on May 9, 2005, during the plaintiffs' Pricing Period, and not on November 30, 2004.  (Id. ¶ 61).

### ACT's Alleged Failure to Disclose the Woodward Warrant

The plaintiffs claim that ACT engaged in a second transaction that should have

---

made after May 9, 2005, when ACT changed the date of execution on the Warrant.

triggered the notice and adjustment requirements of their Warrant Agreements, and that the company intentionally concealed the existence of the transaction in order to avoid its obligations under those Agreements.  Specifically, the plaintiffs allege that, unbeknownst to the plaintiffs, on or about September 15, 2005, during the Pricing Period, ACT executed and delivered a warrant to William Woodward (the "Woodward Warrant"), which entitled Woodward to purchase ACT stock at a price of $0.10 per share.  (Id. ¶¶ 64-66, 72). According to the defendants, however, the Warrant issued to Woodward on September 15, 2005 was for $2.20 per share, and, therefore, did not have to be disclosed.  The defendants contend further that sometime after the Pricing Period, ACT amended the Warrant to reduce the stock price to $0.10 per share, and to extend the period in which it could be exercised.  The relevant allegations are as follows.

Plaintiffs allege in their First Amended Complaint that ACT first disclosed the existence of the Woodward Warrant on November 19, 2009, when ACT filed its Form S-1 Registration Statement with the SEC.  (Id. ¶¶ 65-66).  Therein, ACT revealed that it had engaged in a transaction involving "33,000 shares of common stock issuable upon exercise of warrants with an exercise price of $0.10, issued to William Woodward, on September 15, 2005, for consulting services[,]" and that the warrants were to "terminate on December 31, 2012."  (Id. ¶ 66; Compl., Ex. S at 2).  In response to this allegation, the defendants point to the Form 10-QSB issued by ACT for the period ended September 30, 2005. Therein ACT disclosed that "[o]n September 14, 2005, we issued a warrant to purchase 33,000 shares of common stock at an exercise price of $2.20 per share to William

16

Woodward in connection with consulting services provided to us." (ACT Ex. 2 at p. 3). This disclosure was substantially consistent with the terms of the actual Woodward Warrant, as submitted by the defendants, which is dated September 15, 2005 (not September 14th) and purports to provide for the purchase of 33,000 shares of ACT common stock "at a purchase price of $2.20 per share." (ACT Ex. 3 at p. 1).[9]  The Warrant provides for a termination date of September 14, 2010. (Id. at p. 6).

The plaintiffs, who were apparently unaware of the Form 10-QSB issued in 2005 when they filed their First Amended Complaints, argue that the only inference the court can draw is that the Warrant issued in September 2005 was for $0.10 per share, as reported in 2009, and, therefore, it should have been disclosed during the Pricing Period. The defendants argue that the only rational explanation is that the September 2005 Warrant was for $2.20 per share, and that in 2009 it was amended for a new price of $0.10 per share, and the termination date was extended to December 31, 2011. Neither party has alleged any facts or provided any evidence to support their explanation of these events.

---

[9]  The plaintiffs argue that the court should not consider the Woodward Warrant, which is set forth in ACT's Exhibit 3, "since that document was not filed and may not be authentic given the materially inconsistent reporting of the terms of the warrant issued to Woodward on September 15, 2005." (Pl. Opp. Mem. (Docket No. 25) at 8 n.3). To the extent this argument, raised only in a footnote, merits consideration, this court finds that it is not persuasive. As an initial matter, although the Woodward Warrant is not attached to the plaintiffs' complaints, it is central to their claims and may be considered on a motion to dismiss. See Watterson, 987 F.2d at 3. Furthermore, as described above, the provisions of the Woodward Warrant relating to the price of the shares available for purchase are consistent with the price reported by ACT in its Form 10-QSB for the period ended September 30, 2005. The fact that the Warrant was not filed with the SEC in 2005, and is inconsistent with the later filed Form S-1 Registration Statement, does not establish that it is not authentic.

### Plaintiffs' Exercise of Their Purchase Rights Under the Warrant Agreements

On or about August 25, 2006, each of the plaintiffs submitted a Subscription Agreement to ACT pursuant to which he "irrevocably elect[ed] to exercise the purchase rights represented by such Warrant," and to purchase all shares of common stock covered by the Warrant Agreement. (Compl., Ex. C). The Subscription Agreements were accompanied by letters to Caldwell in which the plaintiffs confirmed their intent to immediately exercise their rights under the Warrant Agreements. (Compl. ¶ 37). Additionally, in their letters, the plaintiffs notified Caldwell that based on information they had obtained from the company's public filings, they believed that ACT had failed to notify them of transactions which entitled them to adjustments under their Warrant Agreements. (Id.). Accordingly, the plaintiffs calculated the adjustments themselves, arrived at a price of $0.4174 per share, and demanded that ACT issue them the appropriate number of additional shares necessary to account for the adjusted share price. (Id. ¶¶ 37-40; Compl, Ex. D at pp. 1-5). Significantly, however, those adjustments were unrelated to either the Engstrom Warrant or the Woodward Warrant, and the plaintiffs allege that if ACT or Caldwell had provided them with accurate information about those Warrants, they would have demanded additional adjustments to their shares. (Compl. ¶ 89).

Shortly thereafter, on August 29, 2006, Caldwell notified Aronson and Gorton that appropriate adjustments would be made to the exercise price of their Warrants, and that ACT would forward them a notice setting forth the necessary calculations. (Id. ¶ 42). However, on or about September 12, 2006, before the plaintiffs had received the promised

notice or obtained any of the shares owed to them by ACT, Aronson and Gorton learned of a more recent transaction, involving the issuance of common stock at a price of $0.288 per share, which entitled them to further adjustments under the post-exercise provisions of their Warrant Agreements.  (Id. ¶ 45).  Consequently, each of the plaintiffs sent Caldwell a letter demanding that ACT make the additional adjustments, and immediately send him the increased number of shares owed as a result of those adjustments.  (Id. ¶ 47).  Because the plaintiffs still had no knowledge of the Engstrom and Woodward Warrants, their demands did not include adjustments resulting from those transactions.  (See id. ¶ 89).

On about September 27, 2006, Aronson sent a letter to ACT's Senior Vice President and General Counsel, Jon Atzen, and to ACT's outside counsel, Chris Howard, reiterating his demand for immediate delivery of the shares owed to him since the exercise of rights under his Warrant Agreement.  (Id. ¶ 48).  Additionally, Aronson requested that ACT provide a schedule detailing any transactions that ACT had entered into during the Pricing Period which would have entitled him to an adjustment.  (Id.).  Later that day, Attorney Howard sent an email to Aronson, which was copied to Gorton, in which Attorney Howard responded to Aronson's request for information.  (Id.; Compl., Ex. K). Therein, Attorney Howard stated in relevant part as follows:

> Please note that ACT is providing an explicit representation and warranty regarding the fact that it has not issued any securities during the pricing period at a price less than $0.288 per share.  These provisions are set forth in new Section 2 of the Release.  This approach should address your concerns regarding issuance of shares below the $0.288 level without necessity of the additional work involved in producing

> schedules.  If there are specific transactions that are of concern
> to you, please let us know.  It should suffice to say that no
> transactions even approach the $0.288 per share price
> underlying your anti-dilution adjustment....

(Compl. ¶ 49, emphasis added).  According to the plaintiffs, this critical representation was misleading because it omitted the fact that ACT had issued securities to Engstrom and Woodward during the Pricing Period at prices below $0.288 per share.  (See id. ¶¶ 50, 52, 64-65).

The plaintiffs claim that in reliance on ACT's representation, and after further review of the company's public filings, Aronson accepted a transfer of 2,870,362 shares from ACT, and Gorton accepted a transfer of 358,799 shares from ACT, on October 4, 2006.  (Compl. ¶ 51; G. Compl. ¶ 51).  However, on October 16, 2006, less than two weeks after the plaintiffs received their stock, ACT's General Counsel notified Aronson and Gorton by email that there had been a mistake in the calculations, that the plaintiffs were entitled to fewer shares than they had received from the company, and that ACT intended to cancel the excess shares.  (Compl. ¶ 68).   A document attached to the email shows that ACT continued to base its calculations on a share price of $0.288 per share. (Compl., Ex. T at p.2).  ACT ultimately abandoned its effort to cancel a portion of the plaintiffs' shares.  Nevertheless, the plaintiffs claim that the statements contained in the October 16, 2006 correspondence also were false and misleading because they failed to disclose the lower share prices reflected in the Engstrom and Woodward Warrants.  (See Compl. ¶¶ 69-71).

## The Instant Action

Aronson commenced the present action on August 23, 2011 by filing a complaint in which he asserted claims against ACT and Wilmington Trust for violations of the Exchange Act based solely on ACT's and Caldwell's alleged misrepresentations and omissions with respect to the Engstrom Warrant.  (See Docket No. 1 ¶¶ 47-58, 63-84).  Aronson did not mention the Woodward Warrant in his original complaint, and did not include any allegations regarding the Woodward Warrant.

On August 25, 2011, Gorton filed his original complaint against ACT and Wilmington Trust.  (Docket No. 1 in C.A. No. 11-11515-NMG).  As in the case of Aronson, Gorton asserted claims against the defendants under the Exchange Act based on alleged misrepresentations and omissions relating to the Engstrom Warrant.  (See id. ¶¶ 49-60, 65-86).  Gorton's original complaint did not mention the Woodward Warrant.  Nor did it contain any allegations concerning the facts of the Woodward Warrant.

Aronson filed his First Amended Complaint on October 13, 2011, and Gorton filed his First Amended Complaint on November 2, 2011.  (Docket No. 4; Docket No. 4 in C.A. No. 11-11515-NMG).  As described above, the plaintiffs, by their Amended Complaints, are asserting claims against the defendants under the Exchange Act based on alleged misrepresentations and omissions as to the Engstrom Warrant and the Woodward Warrant.  Additionally, the plaintiffs are asserting claims for relief against ACT based on its alleged breach of the Warrant Agreements.

Additional factual details relevant to this court's analysis are described below

where appropriate.

## IV. <u>ANALYSIS</u>

### A.    **Claims for Securities Fraud**

The plaintiffs have asserted claims against each of the defendants for alleged violations of the Exchange Act.  Specifically, by their First Claims for Relief, the plaintiffs allege that ACT engaged in securities fraud, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder,[10] by making misrepresentations and omissions regarding the existence of the Engstrom and Woodward Warrants, in order to deceive the plaintiffs into purchasing ACT securities at inflated prices.  They also allege, in their Second Claims for Relief, that Wilmington Trust is liable, pursuant to section 20(a) of the Exchange Act, based on Caldwell's status as a "controlling person" of ACT. In order to state a claim under Section 10(b) and Rule 10b-5 based on misrepresentations and omissions, the plaintiffs must plead the following basic elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a

---

[10]  Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  Rule 10b-5 states: "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.

security; (4) reliance; (5) economic loss; and (6) loss causation, meaning a causal connection between the misrepresentation or omission and the loss.  Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42, 125 S. Ct. 1627, 1631, 161 L. Ed. 2d 577 (2005).  In order to establish control person liability, the plaintiffs must allege (i) an underlying violation by a controlled person or entity, and (ii) control over the primary violator by the defendant. See In re Stone & Webster, Inc. Sec. Litig., 414 F.3d 187, 194 (1st Cir. 2005).  As detailed below, this court finds that the plaintiffs have not stated a claim for primary liability under Section 10(b) and Rule 10b-5.  Therefore, this court recommends that the first two claims of the Amended Complaints alleging Exchange Act violations against ACT (Count I) and Wilmington Trust (Count II) be dismissed.

## 1.  Sufficiency of Allegations as to Misrepresentations and Omissions

The defendants argue that the securities fraud claims must fail at the threshold level because Aronson and Gorton have failed to allege facts showing that ACT made any misrepresentations or omissions with respect to either the Engstrom Warrant or the Woodward Warrant.  Specifically, the defendants argue that the plaintiffs have not alleged a plausible claim that either of those Warrants was "issued" during the Pricing Period at a price that should have triggered adjustments under the plaintiffs' Warrant Agreements. (ACT Mem. (Docket No. 20 in C.A. No. 11-11515-NMG) at 8).  Therefore, the defendants contend that the plaintiffs cannot base their Exchange Act claims on these Warrants.  For the reasons that follow, this court finds that the plaintiffs have failed to state a plausible

claim that ACT made any misrepresentations or omissions with respect to the Engstrom Warrant.  However, the defendants have not shown that the securities claims relating to the Woodward Warrant should be dismissed on this basis.

### The Engstrom Warrant

The relevant provisions of the Warrant Agreements required ACT to notify the plaintiffs and make adjustments to their shares "[i]f and whenever during the Pricing Period, [ACT] shall issue or agree to issue any Equity Units or other securities . . . for a consideration per share or providing for . . . an exercise price per share which is less than the Warrant Purchase Price in effect immediately prior to such issue[.]" (Compl. ¶ 27; Compl., Ex. B ¶ 3.1).  The defendants argue that the Engstrom Warrant did not trigger the notice and adjustment requirements of the Warrant Agreements because ACT issued the Warrant before the Pricing Period began on May 1, 2005.  (ACT Mem. at 8-9).  The plaintiffs contend that the Engstrom Warrant was issued on May 9, 2005, when ACT's counsel sent Engstrom the revised Warrant.  (Pl. Opp. Mem. at 3-4).  For the reasons detailed herein, this court finds that ACT "issued" the Engstrom Warrant before the Pricing Period.

"[T]he interpretation of a contract is a question of law for the courts."[11]  LeBlanc v. Friedman, 438 Mass. 592, 596, 781 N.E. 2d 1283, 1287 (2003).  Under ordinary principles

---

[11]  The Warrant Agreements do not contain a choice of law provision.  (See Compl., Ex. B; ACT Mem. (Docket No. 20 in C.A. No. 11-11515-NMG) at 8 n.8). For purposes of the instant discussion, this court has assumed that Massachusetts law applies.

of contract interpretation, the court "must interpret the words in a contract according to their plain meaning" in order to "determine the objective intent of the parties in making the contract." Polito v. Sch. Comm. of Peabody, 69 Mass. App. Ct. 393, 396, 868 N.E. 2d 624, 626-27 (2007) (quotations and citation omitted).  Accordingly, the court "must put [itself] in the place of the parties to the instrument and give its words their plain and ordinary meaning in the light of the circumstances and in view of the subject matter." Polito, 69 Mass. App. Ct. at 396, 868 N.E. 2d at 627 (quotations and citations omitted). The court may consider a word's accepted dictionary definition in order to determine its ordinary meaning.  See N. Am. Site Developers, Inc. v. MRP Site Dev., Inc., 63 Mass. App. Ct. 529, 534. 827 N.E. 2d 251, 255 (2005) (relying on dictionary to determine word's plain and ordinary meaning).

The Warrant Agreements do not define the word "issue," and they contain nothing to suggest that the word was intended to carry any unusual meaning.[12]  As it pertains to the issuance of stock, the word "issue" is commonly understood to mean "[t]o send out or distribute officially."  Black's Law Dictionary at 908 (9th ed. 2009).  Consistent with the term's plain meaning, this court finds that the Engstrom Warrant was "issued," at the latest, when ACT executed the Warrant and delivered it to Engstrom so that he was able to exercise his right to purchase ACT stock in accordance with the terms of the Warrant.

---

[12]  Although the record does not contain complete copies of the Warrant Agreements, it is undisputed that they do not define the word "issue."  (See ACT Mem. (Docket No. 20 in C.A. No. 11-11515-NMG) at 8 n.8).

Although an argument can certainly be made that the issuance date was April 1, 2005, the date the Warrant was executed and the first date on which it could be exercised, for present purposes it is sufficient that the latest date that the Warrant could be deemed to have been issued was April 29, 2005, when Engstrom received an executed copy of the Warrant granting him the right to purchase 100,000 shares of ACT common stock at any time during the period from April 1, 2005 through April 1, 2010.  (See Compl., Ex. M at pp. 1, 2).  Because the Engstrom Warrant was issued prior to the Pricing Period, ACT had no obligation to disclose it, and cannot be liable for having made any misrepresentations or omissions in order to conceal it from the plaintiffs.

This court's conclusion that the Engstrom Warrant was issued prior to the start of the Pricing Period is consistent with evidence regarding the intent of the parties to the Engstrom Warrant.  As described above, the settlement agreement between ACT and Engstrom called for the Engstrom Warrant to become effective on April 1, 2005.  (ACT Ex. 1 at Exhibit 10.53 ¶ 1).  Moreover, under the Warrant, Engstrom was authorized to exercise his stock purchase rights beginning on April 1, 2005.  (Compl., Ex. M at p. 2).  Thus, the parties to the transaction contemplated that the Warrant would become effective before the Pricing Period began on May 1, 2005.

In their complaints, the plaintiffs allege that "[t]he original issuance date" of the Engstrom Warrant was April 1, 2005, the date of its original execution by ACT.  (See Compl. ¶ 57; Compl., Ex. M at p.7).  However, they argue, based on Attorney Howard's May 9, 2005 letter to Engstrom enclosing the revised Warrant, that "the warrant was

'issued' to Mr. Engstrom as of May 9, 2005, to be effective afterwards when he signed and returned the warrant." (Aronson Opp. Mem. (Docket No. 25) at 3-4). This court finds that the circumstances surrounding the delivery of the revised Engstrom Warrant support no such conclusion. As Attorney Howard explained in his letter, the revised Warrant was "the same in all respects as the Warrant which [Engstrom] previously executed, with the exception of the date." (Compl., Ex. M at p.1). As alleged, it did nothing more than replace the pre-existing Warrant with an identical version re-dated to reflect Engstrom's termination from employment. (See id.). It did not alter any of Engstrom's rights under the Warrant, including his right to purchase stock beginning on April 1, 2005, and there are no allegations indicating that it otherwise impacted the effectiveness of the original Warrant. Because there is nothing in the record to suggest that the re-dating interfered with Engstrom's ability to exercise his purchase rights in April 2005, the plaintiffs have not alleged a plausible claim that the Engstrom Warrant was issued during the Pricing Period.

The plaintiffs nevertheless argue, based on the language of the May 3, 2005 email from Mr. Stewart to Attorney Howard in which Mr. Stewart stated that ACT was "still holding the warrant agreement related to our settlement with Gunnar [Engstrom,]" that the original Engstrom Warrant could not be deemed to have been issued while it was still being "held" in escrow. (Aronson Opp. Mem. at 4). According to the plaintiffs, ACT's decision to hold the Warrant was consistent with the terms of its settlement agreement with Engstrom, which provided that ACT would hold the Warrant Agreement in escrow

27

until Engstrom had complied with certain obligations.  They contend that the Engstrom

Warrant could not have been issued while it was being held by the company, and that "Mr.

Engstrom could not exercise the option to purchase contained in the warrant until it was

released from escrow either."  (Id.).

Again the plaintiffs' argument is unpersuasive.  As an initial matter, the settlement

agreement between Engstrom and ACT called for the Engstrom Warrant to be released

from escrow on April 1, 2005, after Engstrom had provided assistance and documents to

the company.  (See note 6, supra).  There are no allegations that Engstrom did not fulfill

his obligations so as to cause a delay in the release of the warrant from escrow.  (ACT Ex.

1 at Exhibit 10.53 ¶ 1).  Rather, the evidence in the record is that any delay was so that the

parties could decide if the company should withhold taxes.  It was not to prevent Engstrom

from being able to exercise his option on or after April 1, 2005.  (See Compl., Ex. L).

Even more importantly, however, regardless of the language used in the email to the effect

that ACT was "holding the warrant agreement," the record is clear that Engstrom had been

sent a fully executed copy of the Warrant in April.  Thus, on May 9, 2005 he was asked to

return the copy of the Warrant that he had received on April 29, 2005.  The record does

not support the plaintiffs' contention that Engstrom did not have the Warrant prior to May

9, 2005.

Finally, concluding that the Engstrom Warrant had been issued prior to the Pricing

Period is consistent with the plaintiffs' own Warrant Agreements.  The clear intent in the

provisions of the Agreements allowing for a price modification was to insure that the

28

company did not offer others the right to buy stock at a lower price during the Pricing Period.  In the case of Engstrom, ACT clearly had obligated itself to issue his Warrants at the price of $0.25 per share before the Pricing Period and well before the plaintiffs even entered into their own agreements.  Regardless of the date of Engstrom's Warrant, or the date it was released from escrow, the purchase rate had been set, and Engstrom's exercise period had commenced, before May 1, 2005.  The Engstrom Warrant did not have to be disclosed during the Pricing Period.

The requirement that the court "take all well-pled allegations as true and make all reasonable inferences in favor of the plaintiff" does not mean that the court must make unreasonable inferences.  Landy v. D'Alessandro, 316 F. Supp. 2d 49, 60 (D. Mass. 2004). Because the only reasonable inference to be drawn from the record is that the Engstrom Warrant was issued in April 2005, this court concludes that the plaintiffs have failed to state a claim for securities fraud under Section 10(b) and Rule 10b-5 based on misrepresentations and omissions relating to the Engstrom Warrant.

### The Woodward Warrant

The defendants also argue that the plaintiffs' allegations fail to allege any misrepresentation or omission with respect to the Woodward Warrant because they have failed to state a plausible claim that ACT issued the Warrant during the Pricing Period at a price that would have triggered the notice and adjustment provisions of the plaintiffs' Warrant Agreements.  This court disagrees.  In light of the two differing descriptions of the Warrant in the two SEC filings, this court cannot find as a matter of undisputable fact

that the Woodward Warrant at $0.10 per share was not issued during the Pricing Period.

As detailed above, there is evidence based on the Woodward Warrant dated September 15, 2005 and the Form 10-QSB for the period ended September 30, 2005 that in September 2005 Woodward was granted the right to purchase stock until September 14, 2010 at a price of $2.20 per share, a price which would not have had to have been reported to the plaintiffs. (ACT Ex. 2 at p. 3, ACT Ex. 3 at p. 1). However, ACT's Form S-1 Registration Statement, which was filed with the SEC in November 2009, reported that ACT had issued warrants to Woodward on September 15, 2005 which entitled him to purchase stock until December 31, 2012 at an exercise price of $0.10 per share, a price which should have been reported to Aronson and Gorton. (See Compl., Ex. S at p. 2). Given the clear language of the Registration Statement that the warrants were issued in September 2005, this court cannot find at this stage of the litigation that it is not plausible that the Woodward Warrant of $0.10 per share was issued during the Pricing Period.

The defendants argue that the only plausible explanation for the discrepancy in the share prices reported is that the Registration Statement reflected an amendment to the Woodward Warrant. (ACT Mem. at 10, ACT Reply Mem. (Docket No. 29) at 6-7). Thus, they contend that the plaintiffs' "failure to allege the date of the Woodward warrant amendments, combined with the allegation that the amendments were disclosed in November 2009, plainly gives rise to the reasonable inference that the amendments were made after the Pricing Period ended on January 15, 2009, and shortly before the November 2009 disclosure." (ACT Mem. at 11). At this stage, however, the defendants' explanation

is pure conjecture.  There are no allegations, and the parties have not submitted any

documents, substantiating the defendants' theory that an amendment took place.

Furthermore, even if the defendants were correct in their assumption that an amendment

occurred, neither the Form S-1 Registration Statement nor any of the other materials in the

record support an inference that any such amendment occurred after the Pricing Period had

ended.  The conflicting information contained in the Woodward Warrant and in ACT's

Form 10-QSB merely raises a factual issue which cannot be resolved at this stage in the

litigation.  Therefore, the securities' claims based on the Woodward Warrant should not be

dismissed due to the alleged failure of the plaintiffs to establish misrepresentations and

omissions with respect to that Warrant.

## 2.   Timeliness

The defendants contend that even if the plaintiffs have asserted misrepresentations

and omissions which may be actionable under the PSLRA, their securities' claims are

nevertheless barred by the applicable statutes of limitations and/or repose.  This court

agrees that the claims are time-barred.

"Pursuant to 28 U.S.C. § 1658(b), a claim under Section 10(b) and Rule 10b-5 [of

the Exchange Act] must 'be brought not later than the earlier of– (1) 2 years after the

discovery of the facts constituting the violation; or (2) 5 years after such violation.'"

FirstBank Puerto Rico, Inc. v. La Vida Merger Sub, Inc., 638 F.3d 37, 38 (1st Cir. 2011)

(quoting 28 U.S.C. § 1658(b)).  While the defendants have failed to show that any of the

securities law claims are untimely under the 2-year statute of limitations, the record

establishes that all of those claims are barred by the 5-year statute of repose.

## The Engstrom Warrant

For the reasons detailed above, this court has concluded that the Engstrom Warrant was not issued during the Pricing Period and, therefore, cannot form the basis of the plaintiffs' claims. The timeliness of the plaintiffs' claims vis-a-vis this Warrant, therefore, is only being addressed for purposes of completeness.

## Application of the 2-Year Statute of Limitations

The defendants contend that the plaintiffs' claims relating to the Engstrom Warrant are barred by the 2-year statute of limitations set forth in the first prong of 28 U.S.C. § 1658(b) because their securities causes of action accrued more than two years before they filed their original complaints on August 23 and August 25, 2011. (ACT Mem. at 15-17; ACT Mem. (Docket No. 20 in C.A. No. 11-11515) at 16-18). In Merck & Co., Inc. v. Reynolds, 130 S. Ct. 1784, 176 L. Ed. 2d 582 (2010), the Supreme Court held that for purposes of the 2-year limitations period, "a cause of action accrues (1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation' – whichever comes first." 130 S. Ct. at 1789-90. It also held that the "'facts constituting the violation' include the fact of scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" Id. at 1790 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976)). Here, the defendants contend that the plaintiffs knew or should have discovered facts

relating to the May 9, 2005 re-dating of Engstrom's Warrant more than two years prior to the filing of their original complaints.  This court disagrees.

In support of their contention that the plaintiffs knew or should have known about the date change more than two years prior to filing the instant suit, the defendants rely on the plaintiffs' answers to interrogatories in another lawsuit Aronson and Gorton had filed against ACT in the Superior Court of California on October 1, 2007.  In that suit, the plaintiffs alleged that ACT had breached their Warrant Agreements by failing to notify them of instances in which the company had issued stock during the Pricing Period at a price below $2.20 per share.[13]  (See ACT Ex. 4 at pp. 2, 4; ACT Ex. 4 (Docket No. 20-1 in C.A. No. 11-11515-NMG) at pp. 2, 4).  In answering interrogatories on March 4, 2009, the plaintiffs asserted that ACT had breached the Warrant Agreements by issuing 90,566 shares of common stock to a former officer of the company on October 3, 2005, pursuant to the exercise of a 100,000 share warrant exercisable at $0.25 per share, without notifying the plaintiffs or issuing additional shares of ACT stock to them.  (ACT Ex. 4 at p. 4; ACT Ex. 4 (Docket No. 20-1 in C.A. No. 11-11515-NMG) at p. 4).  October 3, 2005 was the date that Engstrom had exercised his purchase rights under his Warrant, and although Engstrom is not mentioned by name in the interrogatory answers, this court will assume for present purposes that the answer does, in fact, refer to Engstrom.  (See Compl. ¶¶ 60,

---

[13]  The plaintiffs do not dispute the defendants' assertion that the court may take judicial notice of materials from a prior litigation between the parties because the plaintiffs have attempted to make the parties' prior litigation history a part of this lawsuit.

63(i)).

The defendants argue, based on these interrogatory responses, that more than two years prior to filing this litigation, Aronson and Gorton knew, or with a reasonably diligent investigation would have discovered, all of the facts necessary to assert their present securities claims based on the Engstrom Warrant, including the fact that the Warrant had been re-dated.[14]  (ACT Mem. at 16-17; ACT Reply Mem. (Docket No. 29) at 2).  However, nothing in the plaintiffs' March 4, 2009 interrogatory responses indicates that the plaintiffs were aware of the alleged backdating of the Warrant, or of any of the related communications that occurred with respect to the Engstrom Warrant.  Therefore, the defendants have not established that the plaintiffs "did in fact discover" the facts constituting the violation alleged in this case at the time they served their discovery responses or at any other point during the course of the California litigation.  See Merck & Co., Inc., 130 S. Ct. at 1789.

---

[14]  The plaintiffs argue that ACT's argument rests on the inquiry notice standard which was rejected by the Supreme Court in Merck.  (Aronson Opp. Mem. at 16-17).  This court disagrees.  It is true that in Merck, the Supreme Court rejected the argument that the limitations period should begin to run at the point when a plaintiff is on "inquiry notice," but fails to undertake an investigation.  Merck, 130 S. Ct. at 1797-98.  Instead, the Court held that the limitations period does not begin to run until "the plaintiff did discover or a reasonably diligent plaintiff would have discovered the facts constituting the violation – whichever comes first."  Id. at 1798 (internal quotations and punctuation omitted).  However, the defendants are not arguing that the statute began to run at the point when the plaintiffs were put on inquiry notice of their claims.  Rather, they are arguing, based on the materials from the California litigation, that a reasonably diligent plaintiff prosecuting that action would have undertaken an investigation and would have discovered all of the facts necessary to support the present claims more than two years before Aronson and Gorton filed their complaints in this action.  (See ACT Mem. at 16-17).

Furthermore, the record does not establish that a reasonably diligent plaintiff would have discovered facts regarding the alleged backdating more than two years before the plaintiffs filed their complaints in this case.  As described above, the plaintiffs' claims in the California matter were based on Engstrom's exercise of his Warrant on October 3, 2005, during the course of the Pricing Period.  Nothing in the plaintiffs' interrogatory responses indicates that Aronson and Gorton were pursuing other possible theories of liability or that discovery relating to the date of the issuance of the Engstrom Warrant would have been relevant to their claims.  Furthermore, as alleged in this litigation, ACT repeatedly stated in its public disclosures that the Engstrom Warrant had been issued on November 30, 2004.  (See ACT Ex. 1 at p. 12; Compl. ¶¶ 59-60).  The defendants have not pointed to anything in the material from the California action, or elsewhere in the record, showing that the plaintiffs had reason to question the veracity of those statements at any time prior to two years before filing suit in this court.  Accordingly, the defendants have not shown that the 2-year statute of limitations bars the securities claims based on the Engstrom Warrant.

### Application of the 5-Year Statute of Repose

The defendants also argue that the 5-year statute of repose set forth in the second prong of 28 U.S.C. § 1658(b) bars all of the plaintiffs' securities law claims.  Unlike the 2-year statute of limitations, "[t]he five-year period of repose serves 'as a cutoff' and 'tolling principles do not apply.'"  Goldenson v. Steffens, 802 F. Supp. 2d 240, 257-58 (D. Me.

2011) (quoting Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilberson, 501 U.S. 350, 363, 111 S. Ct. 2773, 115 L. Ed. 2d 321 (1991)).  This court concludes that the repose period began to run more than five years before the plaintiffs filed their original complaints in this action.  Therefore, their securities law claims based on the Engstrom Warrant should be dismissed as untimely.

As described above, under 28 U.S.C. § 1658(b)(2), a claim under Section 10(b) and Rule 10b-5 must be brought within 5 years of a violation.  "A 'violation' of section 10(b) occurs . . . on the date that the alleged fraudulent misrepresentation is made or, in the case of an omission, on the date a duty to disclose the withheld information arises."  Nw. Human Servs., Inc. v. Panaccio, No. Civ. A. 03-157, 2004 WL 2166293, at *18 (E.D. Pa. Sept. 24, 2004).  Accordingly, where, as here, the plaintiff claims that the defendant violated the securities laws by concealing material information, the 5-year period of repose begins to run "upon the date a duty to disclose the withheld information arises."  In re Prudential Ins. Co. of Am. Sales Practices Litig., 975 F. Supp. 584, 605 (D.N.J. 1997).

In the instant case, the plaintiffs allege that under the Warrant Agreements, ACT was obligated to notify Aronson and Gorton whenever securities were issued to third parties with terms that triggered the plaintiffs' adjustment rights.  (Compl. ¶ 29).  Thus, in the case of the Engstrom Warrant, which was issued before the parties entered into the Warrant Agreements, ACT's duty to disclose would have arisen in September 2005, when their Warrant Agreements were executed and delivered to the plaintiffs.  (See Compl. ¶ 72

(claiming that ACT had a duty to notify the plaintiffs of the Engstrom Warrant beginning on the date of its alleged issuance on May 9, 2005 and continuing thereafter)).  Because the plaintiffs did not file their original complaints until August 2011, more than five years later, their securities law claims are time-barred.

The plaintiffs also contend that the defendants violated the securities laws by making an affirmative misrepresentation on September 27, 2006, when ACT represented that it had not issued shares during the Pricing Period below the price of $0.288 per share. (Id. ¶ 49; see also Aronson Opp. Mem. (Docket No. 26 in C.A. No. 11-11492-NMG) at 2 (asserting that ACT's representation in September 2006 constituted an actionable misrepresentation)).  Where securities fraud claims are based on affirmative misrepresentations, "the repose period begins when the *last* alleged misrepresentation was made by any of the participants."  Winters v. Stemberg, 529 F. Supp. 2d 237, 246 (D. Mass. 2008) (quoting Cont'l Bank, Nat'l Ass'n v. Ludlow, 777 F. Supp. 92, 102 (D. Mass. 1991)) (punctuation omitted).  However, in order to be actionable, the alleged misrepresentation on which the plaintiff relies must have occurred before the purchase and sale of the securities.  See Levine v. Diamanthuset, Inc., 950 F.2d 1478, 1487 (9th Cir. 1991) ("conduct actionable under Rule 10b-5 must occur before investors purchase the securities, if – as here – they allege fraud induced them to make the purchase"); In re Exxon Mobil Corp. Sec. Litig., 387 F. Supp. 2d 407,  422 (D.N.J. 2005) ("it is a matter of simple logic that any such misrepresentation or omission must have occurred prior to the

'purchase or sale' of securities"); Haft v. Eastland Fin. Corp., 772 F. Supp. 1315, 1318

(D.R.I. 1991) (in order for plaintiff to maintain a claim under Section 10(b), alleged

misrepresentations "must have occurred *prior to [plaintiff's] purchase or sale of*

*securities*").  In this case, the purchase of securities occurred prior to September 27, 2006.

Therefore, the alleged misrepresentation is not actionable under the securities laws.

      "The purchase or sale of securities occurs when the parties involved in the

securities sale are irrevocably committed to one another."  Romani v. Shearson Lehman

Hutton, Inc., Civ. A. No. 89-1675-MC, 1990 WL 150011, at *1 (D. Mass. Sept. 25, 1990).

However, this does not mean that the transfer of securities must be completed at that time.

"The 'purchase or sale of securities within the meaning of Rule 10b-5 is to be determined

as the time when the parties to the transaction are committed to one another,' even if the

exchange of money and shares happens at a later time."  Vacold LLC v. Cerami, 545 F.3d

114, 122 (2d Cir. 2008) (quoting Radiation Dynamics v. Goldmuntz, 464 F.2d 876, 891

(2d Cir. 1972)) (internal quotations omitted).  See also Jordan v. McDonald, 803 F. Supp.

493, 495 (D. Mass. 1992) (finding that sale occurs for purposes of claims under § 12(2) of

the Securities Act of 1933 "when the parties obligate themselves to perform what they had

agreed to perform even if the formal performance of their agreement is to be after a lapse

of time") (quotations, punctuation and citations omitted).  In the instant case, such a

commitment occurred on August 25, 2006, when the plaintiffs submitted Subscription

Agreements to ACT by which they irrevocably elected to exercise their purchase rights

under their Warrant Agreements.   See Romani, 1990 WL 150011, at *1 (finding that

Subscription Agreement signed by plaintiff "was binding and constituted the date of sale

for purposes of the statute of limitations").   Therefore, the plaintiffs cannot base their

securities claims on ACT's September 27, 2006 representation.   The claims based on the

Engstrom Warrant are barred by the statute of repose.

## The Woodward Warrant

As detailed above, the plaintiffs have asserted a claim that ACT made fraudulent

misrepresentations and wrongfully failed to disclose that the Woodward Warrant was

issued at the purchase price of $0.10 per share on September 15, 2005.   However, this

claim is also barred by the statute of repose.

To the extent that the plaintiffs are claiming that ACT should have disclosed the

Woodward Warrant when the Warrant was issued on September 15, 2005, those claims

are barred by the 5 year statute of repose for the same reasons that the claims regarding

the Engstrom Warrant are time barred.   Similarly, the plaintiffs cannot rely on any

representations made on September 27, 2006 relating to the lowest share price

outstanding, since that representation was made after the plaintiffs irrevocably committed

to purchasing the stock under their Warrant Agreements, as explained above.

Even assuming, however, that the September 27, 2006 representation is actionable,

it is still time-barred in connection with the Woodward Warrant.   The plaintiffs did not

assert any claims arising out of the Woodward Warrant until they filed their Amended

Complaints on October 13, 2011 and November 2, 2011, more than five years after the alleged misrepresentation on September 27, 2006.  Under Fed. R. Civ. P. 15(c), "a new claim or set of allegations that would otherwise be time-barred [may] 'relate back' to the date of filing the initial complaint."  In re Stone & Webster, Inc. Sec. Litig., Civil Action No. 00-10874-RWZ, 2006 WL 1738348, at *3 (D. Mass. June 23, 2006).  However, that rule applies only where "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading[.]"  Fed. R. Civ. P. 15(c)(1)(B).  It does not apply when the amendment "assert[s] a claim which was not even suggested in the original complaint."  O'Loughlin v. Nat'l R.R. Passenger Corp., 928 F.2d 24, 26 (1st Cir. 1991).  Because the allegations in the original complaints contained no hint of the Woodward Warrant, there can be no relation back under Fed. R. Civ. P. 15(c) with respect to claims arising out of the Woodward Warrant.  See In re Stone & Webster, Inc. Sec. Litig., 2006 WL 1738348, at *3 ("courts are more likely to allow amendment under [Rule 15(c)] where the plaintiff seeks to assert a new legal theory based upon the same facts, than to allow assertion of entirely new facts").  Accordingly, those claims would remain time-barred even if the September 27, 2006 statement were actionable.

For all these reasons, the plaintiffs' securities claims are barred by the statute of repose and should be dismissed.

### 3.    **Failure to Plead Scienter**

The defendants also assert that the plaintiffs have failed to state a claim for securities fraud because they have failed to plead facts supporting a strong inference of scienter on the part of ACT.  While this issue does not need to be reached in light of this court's conclusions above, this court will address scienter for the sake of completeness. As detailed herein, this court agrees that the allegations are not sufficient.

### Scienter Standard of Review

"To win a section 10(b) case, the plaintiff must show either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness." Aldridge, 284 F.3d at 82.  "[T]he plaintiff may combine various facts and circumstances indicating fraudulent intent to show a strong inference of scienter."  Id.  Accordingly, "[s]cienter may be demonstrated by indirect evidence, and may extend to a form of extreme recklessness that 'is closer to a lesser form of intent.'"  In re Cabletron Sys., Inc., 311 F.3d at 38 (citations omitted).  However, "[a] showing of negligence or 'mere recklessness' does not suffice."  In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d 161, 166 (D. Mass. 2000) (quoting In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 976 (9th Cir. 1999)).  The Plaintiffs must set forth "specific facts that make it reasonable to believe that defendant[s] knew that a statement was materially false or misleading."  Id. (quoting Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 (1st Cir. 1994)).

The First Circuit "has rejected any rigid formula for pleading scienter, preferring to rely on a 'fact-specific approach' that proceeds case by case.  In re Cabletron Sys., Inc., 311 F.3d at 38.  In evaluating whether a "strong inference" of scienter has been pled in a

particular case, the court must consider "the complaint as a whole." N.J. Carpenters

Pension & Annuity Funds v. Biogen Idec Inc., 537 F.3d 35, 45 (1st Cir. 2008).  Moreover,

"[a] court must weigh not only inferences urged by the plaintiff . . . but also competing

inferences rationally drawn from the facts alleged." Id. (quotations and citations omitted).

"An inference of fraudulent intent may be plausible, yet less cogent than other,

nonculpable explanations for the defendant's conduct.  To qualify as 'strong' . . . an

inference of scienter must be more than merely plausible or reasonable — it must be

cogent and at least as compelling as any opposing inference of nonfraudulent intent."

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314, 127 S. Ct. 2499, 2504-05,

168 L. Ed. 2d 179 (2007).

### Allegations of Intent with Respect to the Engstrom Warrant

This court finds that when the Amended Complaint is viewed as a whole, the

plaintiffs have failed to allege facts supporting a strong inference that ACT acted with

extreme recklessness or an intent to defraud with respect to the Engstrom Warrant that is

more compelling than the competing inference that the defendants acted with a

nonfraudulent intent.  Notably, any conclusion that ACT was acting with a fraudulent state

of mind when it engaged in the process of backdating the Engstrom Warrant is

undermined by the fact that the backdating process occurred months prior to ACT's

issuance of the Warrant Agreements to the plaintiffs.  As described above, the alleged

backdating took place on or about May 9, 2005, but the Warrant Agreements were not

issued until September 14, 2005.  (Compl. ¶ 54; Compl., Ex. B at pp. 8-9; G. Compl., Ex. B at pp. 7-8).  Because the Warrant Agreements did not exist at the time of the alleged backdating, there is no logical basis for concluding that ACT engaged in the re-dating process in order to avoid its obligations under those Agreements.

The plaintiffs concede that "[t]he back-dating of the Engstrom warrant in May 2005 alone may not have been motivated by an intent to de-fraud," but they argue that ACT's later representation that it had not issued shares during the Pricing Period at a price of less than $0.288 per share, and its failure to disclose the Engstrom Warrant after the plaintiffs exercised their purchase rights, are actionable and were done with scienter.  (Aronson Opp. Mem. at 12).  This argument is not persuasive.

While the plaintiffs have made a number of generalized allegations of wrongdoing they have failed to confront the seemingly plausible business reasons put forth by ACT.  Thus, it is undisputed that the changed date coincided with the date Engstrom left the company, and that ACT had expressed that the change was needed in order to conform to ACT's Equity Tracking Matrix even before the plaintiffs' Warrant Agreements were issued.  Moreover, the amended Warrant did not alter the dates that Engstrom's purchase rights could be exercised, and it seems that the fact that the dates were changed during the Pricing Period (as opposed to having it all completed before the Pricing Period) was fortuitous, and due only to the attorneys' getting around to the matter in May 2005.  Under such circumstances, the plaintiffs have failed to show that the defendants even knew that

the statements about the date of the Engstrom Warrant were false or misleading.  See

Geffon v. Micrion Corp., 249 F.3d 29, 35 (1st Cir. 2001) (scienter requires "more than

mere proof that the defendants knowingly made a particular statement.  The plaintiff must

prove that defendants knew . . . that the statement was false or misleading[.]"); Ezra

Charitable Trust v. Tyco Int'l, Ltd., 466 F.3d 1, 9 (1st Cir. 2006) (in order to plead

scienter, plaintiffs must allege "facts that strongly suggest that the defendants knew any of

the challenged statements were false when made").  Even more significantly, they have

failed to establish that any inference of scienter is "at least as compelling as any opposing

inference of nonfraudulent intent."  Tellabs, Inc., 551 U.S. at 314, 127 S. Ct. at 2505.

　　　　In support of their claim that ACT was acting with a fraudulent intent with respect

to the Engstrom Warrant, the plaintiffs allege that the company's "fraudulent

misrepresentation enabled ACT to avoid its contractual obligations to Aronson [and

Gorton]."  (Compl. ¶ 63a).  Such conclusory allegations are insufficient to support a

strong inference of scienter.  See Suna v. Bailey Corp., 107 F.3d 64, 68 (1st Cir. 1997)

(explaining that plaintiffs may not base claims of fraud on conclusory allegations).  In

addition, the plaintiffs have put forth unsubstantiated and very confusing theories to the

effect that by changing the date on the Engstrom Warrant to a date before ACT became a

publicly traded company, ACT could engage in accounting irregularities, violate GAAP,

mislead the SEC and other warrant holders, and benefit Engstrom to the tune of

approximately $124,000.00.  (See Aronson Opp. Mem. at 13-14; Compl. ¶¶ 63a-c,63g,

44

63i).  "Merely stating in conclusory fashion that a company's books are out of compliance with GAAP [does] not in itself demonstrate liability under section 10(b) or Rule 10b-5."  In re Cabletron Sys., Inc., 311 F.3d at 34.  Moreover, "'catch-all allegations' which merely assert motive and opportunity, without something more, fail to satisfy the PSLRA."  Ezra Charitable Trust, 466 F.3d at 10 (quoting Cabletron Sys., Inc., 311 F.3d at 39).  In short, the plaintiffs have failed to address the undisputed facts which indicate that the date change was done for a legitimate business reason, have failed to establish how any accounting irregularities or attempts to mislead third parties or the SEC demonstrate an intent to perpetrate a fraud upon Aronson and Gorton, and have otherwise failed to allege facts to support the conclusion that the defendants acted with scienter.  Therefore, the securities claims related to the Engstrom Warrant should be dismissed for this reason as well.[15]

### Allegations of Intent with Respect to the Woodward Warrant

The plaintiffs' allegations regarding the Woodward Warrant are similarly insufficient to support a strong inference of scienter.  As in the case with the Engstrom Warrant, the only allegation of intent which specifically pertains to Aronson and Gorton is that ACT's misrepresentations and omissions with respect to the Woodward Warrant

---

[15]  The plaintiffs note that "judges in at least three cases have entered preliminary injunctions against ACT ordering it to issue substantial amounts of additional stock to [other] warrant holders."  (Aronson Opp. Mem. at 14).  However, such evidence is not relevant to the claims in this case and does not establish or even suggest that ACT was acting with scienter by failing to disclose information to the plaintiffs regarding the terms of the Engstrom and Woodward Warrants.

"enabled ACT to avoid its contractual obligations to [the plaintiffs]."  (Compl. ¶ 67a).  For the reasons discussed above, such allegations are inadequate to show that the defendant had a conscious intent to defraud or acted with a high degree of recklessness. Therefore, they do not support a claim for securities fraud.

In addition, the plaintiffs do not address the glaring fact that the Woodward Warrant was reported to have an exercise price of $2.20 per share in 2005, at the time the Warrant apparently was issued, or that the Woodward Warrant itself set forth a price of $2.20 per share.  The fact that a later SEC filing was inconsistent could easily be explained by poor wording or negligence.  Therefore, it is insufficient to establish either that the defendants knew that their statements to the plaintiffs were false or misleading or that they acted with a wrongful intent by failing to disclose the Woodward Warrant.

The remaining allegations of intent relating to the Woodward Warrant show, at most, that ACT had the motive and opportunity to commit fraud on other shareholders or to benefit from its alleged wrongdoing.  Reading the confusing allegations most generously, the plaintiffs allege that (1) the Woodward Warrant reflected a sharp discount from the market value of ACT's stock; (2) disclosure of the Woodward Warrant would have raised objections from other investors who had received convertible debentures and warrants to purchase ACT common stock at an initial exercise price of $2.53 per share; (3) Caldwell had an incentive to reward Woodward for Woodward's alleged assistance in helping Caldwell to obtain employment at ACT; and (4) ACT's concealment of the

Woodward Warrant enabled the company and Caldwell to escape scrutiny and avoid unspecified administrative and/or litigation proceedings against them for potential violations of the securities laws.[16]  (Id. ¶¶ 67c-67j).  Such "catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are not sufficient."  Greebel, 194 F.3d at 197 (internal punctuation and citation omitted).  Therefore, they do not support a claim for relief under the Section 10(b) or Rule 10b-5.[17]

### B.   Claims for Breach of Contract

By their Third, Fourth and Fifth Claims for Relief, the plaintiffs are seeking relief against ACT based on its alleged breach of its obligations under the Warrant Agreements. The defendants have moved to dismiss these claims on the grounds that the plaintiffs have failed to allege any breach.  Specifically, they contend that because the Engstrom Warrant was issued prior to the Pricing Period, ACT could not have breached the Warrant Agreements by failing to provide the plaintiffs with notice or to make adjustments to their shares as a result of the Engstrom Warrant.  They further contend that because the plaintiffs have failed to allege that the Woodward Warrant contained an exercise price

---

[16]  The plaintiffs also allege that ACT failed to disclose any details regarding the Woodward Warrant until after the expiration of the plaintiffs' Pricing Period.  (Compl. ¶ 67(b)). This allegation is undermined by the fact that the plaintiffs disclosed the transaction in its Form 10-QSB for the period ended September 30, 2005.  (See ACT Ex. 2 at p.3).

[17]  In light of this court's conclusion that the plaintiffs' claims for securities fraud are untimely and otherwise fail to state a claim, it is unnecessary at this time to address the defendants' remaining arguments as to why the plaintiffs' First and Second Claims for relief should be dismissed.

below $2.20 per share at any time during the Pricing Period, they cannot show that ACT breached its obligations by failing to disclose the Woodward Warrant or to make adjustments as a result of that transaction.  (ACT Opp. Mem. at 17-19).  As this court has described in detail above, the plaintiffs' own allegations and exhibits show that the Engstrom Warrant was issued prior to the start of the Pricing Period.  Therefore, to the extent the plaintiffs' breach of contract claims are based on the Engstrom Warrant, those claims should be dismissed.  However, because the plaintiffs have stated a plausible claim that ACT issued warrants to Woodward at a price that should have triggered the plaintiffs' rights under their Warrant Agreements, this court recommends that the motions to dismiss the breach of contract claims be denied to the extent those claims are based on the Woodward Warrant.[18]

### C.   Plaintiffs' Request for a Preliminary Injunction

Among the relief that the plaintiffs are seeking in connection with their breach of contract claims is an order

> preliminarily enjoining and restraining ACT from issuing shares of common stock to any person or entity other than [the

---

[18]  In their oppositions to the motions to dismiss, the plaintiffs state that they "did not intend to limit claims for breach of contract to the Woodward and Engstrom transactions as it appears that ACT engaged in further transactions after issuance of the stock to [the plaintiffs] which would have called for a further adjustment under the post-exercise adjustment clause." (Aronson Opp. Mem. at 19).  However, there are no allegations in the Amended Complaints that would support such a theory.  Although the plaintiffs allege that they discovered two other transactions which should have triggered adjustments under their Warrant Agreements, there is no dispute that ACT complied with the plaintiffs' demands to adjust their shares as a result of those transactions.  (See Compl. ¶¶ 37-51).  The plaintiffs cannot defeat dismissal on the basis of other transactions which have not been alleged in their complaints.

> plaintiffs] or another party to the Settlement Agreement unless
> and until ACT complies with its contractual obligation to
> afford [the plaintiffs] the opportunity to purchase the number
> of additional shares and at the price required under the
> Warrant Agreement[.]

(Compl. at Prayer for Relief ¶ C).  The plaintiffs allege that such relief is appropriate

because they have no adequate remedy at law and because the Settlement Agreement

provides for specific performance at the plaintiffs' option.  (Compl. ¶¶ 100-01).

The defendants have moved to dismiss this claim on the grounds that no such relief

is contemplated under the plaintiffs' Warrant Agreements, and the plaintiffs have not met

the requirements necessary to justify such relief.  (Aronson Mem. at 19-20).  The plaintiffs

did not address this issue in their written submissions.  However, at oral argument, the

plaintiffs confirmed that they are not pursuing injunctive relief at this time, and that the

relief that they will be seeking at the conclusion of trial will be consistent with their rights

under their Warrant Agreements.  In this court's view, it would be premature to fashion

any relief in this case at this time, or to limit the options available for relief at the

conclusion of trial.  Consequently, this court recommends that the motions to dismiss the

request for injunctive relief be denied without prejudice.

### D.    Plaintiffs' Request for Leave to Amend

Finally, the plaintiffs have requested that they have an opportunity to amend their

complaints in the event the court finds that any of their claims are deficient.  To the extent

that the plaintiffs are seeking leave to replead Exchange Act claims arising out of

Engstrom and Woodward Warrants, this court recommends that leave to amend be denied. In light of this court's conclusion that the plaintiffs' securities claims are time-barred, any attempt to amend those claims would be futile.  See Transwitch Corp. v. Galazar Networks, Inc., 377 F. Supp. 2d 284, 290 (D. Mass. 2005) (listing futility as a basis for denying leave to amend).

To the extent that the plaintiffs believe that they have other claims against the defendants, the viability of any such claims should await the filing of a motion to amend. That way the court will be presented with specific proposed amendments and the defendants will have an opportunity to present their positions.

## V.  CONCLUSION

For all of the reasons described above, this court finds that the plaintiffs have failed to state a claim against the defendants for violations of the federal securities laws, and recommends that Counts I and II of the plaintiffs' First Amended Complaints be dismissed with prejudice.  This court also concludes that the plaintiffs' allegations are sufficient at this stage in the litigation to state a claim against ACT for breach of contract relating to the Woodward Warrant.  Therefore, this court recommends to the District Judge to whom this case is assigned that Wilmington Trust's motions to dismiss (Docket Nos. 13, 37) be ALLOWED and that ACT's motions to dismiss be ALLOWED IN PART and DENIED IN PART, in accordance with this decision.[19]

---

[19]  The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection

  / s / Judith Gail Dein

Judith Gail Dein
United States Magistrate Judge

---

thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).