UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GARY D. ARONSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 11-11492-NMG |
| ADVANCED CELL TECHNOLOGY, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| and | ) | |
| | ) | |
| JOHN S. GORTON, AS TRUSTEE OF THE | ) | |
| JOHN S. GORTON SEPARATE PROPERTY | ) | |
| TRUST, DATED 3/3/1993, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 11-11515-NMG |
| ADVANCED CELL TECHNOLOGY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION ON
DEFENDANT'S PARTIAL MOTION TO DISMISS
AND ORDER ON DEFENDANT'S MOTION FOR SANCTIONS**

August 26, 2013

DEIN, U.S.M.J.

# I.  INTRODUCTION

These consolidated actions arise out of Warrants to Purchase Securities (the "Warrant Agreements"), which the defendant, Advanced Cell Technology, Inc. ("ACT"), issued to the plaintiffs, Gary D. Aronson ("Aronson") and John S. Gorton, as Trustee of the John S. Gorton Separate Property Trust, Dated 3/3/1993 ("Gorton").  Under the

Warrant Agreements, the plaintiffs were entitled to purchase shares of ACT stock at a set price, and also were entitled to certain adjustments in the share price and number of shares they would receive in the event ACT issued, or agreed to issue, lower priced shares to a third party during the time period known as the Pricing Period.  By their claims in this action, the plaintiffs assert that ACT violated its obligations under the Warrant Agreements by concealing the existence of transactions with third parties that occurred during the Pricing Period and should have triggered adjustments to the number and price of the plaintiffs' shares.

Following the court's ruling on the defendants'[1] motions to dismiss the plaintiffs' First Amended Complaints, Aronson and Gorton sought leave to amend their complaints. Those motions were allowed without opposition, and the plaintiffs each filed Second Amended Complaint asserting four claims against ACT for breach of its obligations under the Warrant Agreements.  Specifically, by their First Claims for Relief, the plaintiffs have restated their earlier claims (which were not dismissed) that ACT breached the Warrant Agreements by failing to notify Aronson and Gorton regarding its issuance of a warrant to William Woodward (the "Woodward Warrant"), and by failing to make adjustments to the plaintiffs' shares as a result of the Woodward Warrant.  By their Second, Third and Fourth Claims for Relief, Aronson and Gorton have added allegations that ACT breached

---

[1]  Originally, the plaintiffs named as defendants both ACT and Wilmington Trust, N.A., as Special Administrator of the Estate of William MacKay Caldwell ("Wilmington Trust"). However, all of the claims against Wilmington Trust have been dismissed, and it is no longer a party to the litigation.

the Warrant Agreements by failing to notify them of additional transactions that should have triggered adjustments to their shares.[2]  The additional transactions include the issuance of a warrant to Deron Colby (the "Colby Warrant") and the extension of exercise periods contained in warrants that were issued to Andwell, LLC (the "Andwell Warrant") and Nancy Burrows (the "Burrows Warrant").  They also include sales of stock to entities known as Outboard, Ice Cap Holdings ("Ice Cap") and Tuxedo Holdings ("Tuxedo"), which ACT allegedly agreed to make in exchange for the cancellation of debt.

The matter is presently before the court on "Advanced Cell Technology's Partial Motion to Dismiss Plaintiffs' Second Amended Complaints" (Docket No. 63), by which ACT is seeking the dismissal of the plaintiffs' Second, Third and Fourth Claims for Relief, with prejudice, for failure to state a claim under Fed. R. Civ. P. 12(b)(6).   For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that ACT's partial motion to dismiss be ALLOWED IN PART and DENIED IN PART.  Specifically, this court finds that Aronson and Gorton have failed to state claims for breach of contract based on ACT's alleged sales of stock to Outboard, Ice Cap and Tuxedo, but that their allegations relating to the Colby Warrant and the extension of the exercise periods contained in the Andwell and Burrows Warrants are sufficient to

---

[2]  Aronson has mistakenly labeled both his third claim and his fourth claim as "Third Claim for Relief."  For purposes of this decision, this court has referred to Aronson's fourth claim as the "Fourth Claim for Relief."

withstand the motion to dismiss.  Therefore, this court recommends that the Fourth

Claims for Relief be dismissed, but that the motion be denied with respect to the Second

and Third Claims for Relief.  Furthermore, because this court finds that the pleading

defect concerning the alleged sales of stock to Outboard, Ice Cap and Tuxedo can be

quickly and easily remedied, this court recommends that the plaintiffs have an

opportunity promptly to amend their Fourth Claims for Relief following the court's final

ruling on the motion to dismiss.

This matter is also before the court on "ACT's Motion for Sanctions Against

Plaintiffs" (Docket No. 69), by which ACT is seeking an award of attorneys' fees and

costs that it has incurred in connection with its defense of the Second, Third and Fourth

Claims for Relief.  The defendant contends that such sanctions are warranted, pursuant to

Fed. R. Civ. P. 11, because the claims at issue are frivolous.  For the reasons described

below, this court finds that the plaintiffs' claims are not frivolous and that sanctions

would not be appropriate.  Accordingly, ACT's motion for sanctions against Aronson and

Gorton is DENIED.

## II.  <u>STATEMENT OF FACTS</u>

When ruling on a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), the

court must accept as true all well-pleaded facts, and give the plaintiff the benefit of all

reasonable inferences.  <u>See</u> <u>Cooperman v. Individual, Inc.</u>, 171 F.3d 43, 46 (1st Cir.

1999).  "Ordinarily, a court may not consider any documents that are outside of the

complaint, or not expressly incorporated therein, unless the motion is converted into one

for summary judgment." Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001). "There is, however, a narrow exception 'for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'" Id. (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)). Applying this standard to the instant case, the facts relevant to ACT's motion to dismiss are as follows.[3]

## The Parties

Defendant ACT is an early stage biotechnology company that is incorporated in Delaware and has its principal place of business in Marlborough, Massachusetts. (Compl. ¶ 1).[4] Its common stock is registered with the Securities and Exchange

---

[3] In addition to the plaintiffs' Second Amended Complaints (Docket Nos. 59 and 60), this court has considered the warrant agreements included in Exhibits 1 through 3 attached to ACT's Memorandum of Law in Support of Partial Motion to Dismiss Second Amended Complaints (Docket No. 64) ("Def. Ex. __"), as well as the warrant agreements and SEC Form 4 included in Exhibits 3 through 6 attached to the Plaintiffs' Joint Opposition to Advanced Cell Technology's Partial Motion to Dismiss Plaintiffs' Second Amended Complaint (Docket No. 68) ("Pl. Ex. __"). The warrant agreements are central to the plaintiffs' claims and are referred to in the Second Amendment Complaints, while the SEC Form 4 is a public record. Therefore, it is appropriate for this court to consider them on a motion to dismiss. See Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d at 33. However, the remaining exhibits submitted by the parties, including correspondence from Deron Colby to Pierce Atwood, LLP and documents produced by ACT to the plaintiffs' counsel, are outside the pleadings and may not be considered at this stage in the litigation.

[4] The plaintiffs' Second Amended Complaints are nearly identical. Accordingly, as a general matter, this court has cited only to Aronson's Second Amended Complaint (Docket No. 59). To the extent it is necessary to cite to Gorton's Second Amended Complaint (Docket No. 60), it shall be cited as "G. Compl. ¶ __."

Commission ("SEC"), and its shares are traded under the symbol "ACTC."  (Id.).

Plaintiff Aronson is a citizen of Nevada, and an investor in early stage start-up

biotechnology companies.  (Id. ¶ 2).  He has owned shares of ACT common stock for

over six years.  (Id.).  Plaintiff Gorton is a citizen of California.  (G. Compl. ¶ 2).  Like

Aronson, Gorton is a shareholder of ACT, and has owned shares of ACT common stock

during the time period that is relevant to this case.  (Id.).

### The Plaintiffs' Warrant Agreements

The Warrant Agreements at the center of this litigation arose out of a legal dispute

that began in 2004, when Aronson and Gorton brought a collection action against ACT's

predecessors and two of their officers in Worcester Superior Court.  (Compl. ¶ 4).

Following a year of litigation, during which time ACT's predecessors allegedly violated

or sought to avoid the state court's orders, the parties reached a settlement, which was

memorialized in a Settlement Agreement dated September 14, 2005.  (Id.).  Pursuant to

the terms of that Agreement, ACT was required to issue a Warrant to Purchase Shares

("Warrant Agreement") to each of the plaintiffs.  (Id. ¶ 5; G. Compl. ¶ 6).  Accordingly,

ACT executed Warrant Agreements on September 14, 2005, and delivered them to

Aronson and Gorton.  (Compl. ¶ 5; G. Compl. ¶ 6).

Pursuant to Aronson's Warrant Agreement, Aronson had the initial right to

purchase, at any time through January 15, 2009, 375,756 shares of ACT common stock at

a price of $2.20 per share (the "Warrant Purchase Price").  (Compl. ¶ 6).  Similarly, under

his Warrant Agreement, Gorton was granted the initial right to purchase, at any time

through January 15, 2009, 46,970 shares of ACT common stock at the Warrant Purchase

Price of $2.20 per share.  (G. Compl. ¶ 7).  Additionally, the plaintiffs were entitled to

automatic adjustments in the number and purchase price of their shares in the event ACT

issued or agreed to issue lower priced shares to a third party during the time period

between May 1, 2005 and January 15, 2009 (the "Pricing Period").  (Compl. ¶ 7; G.

Compl. ¶ 8).  As detailed below, the plaintiffs claim that during the Pricing Period, ACT

issued, or agreed to issue, lower priced shares to various third parties without notifying

the plaintiffs of those transactions or making the automatic adjustments called for under

their Warrant Agreements.

      Section 3 of the plaintiffs' Warrant Agreements governed the circumstances under

which adjustments were to be made before the plaintiffs exercised their purchase rights.

(Compl. ¶ 8; G. Compl. ¶ 9).  Specifically, the relevant portions of Section 3 provided:

> 3.  ADJUSTMENT OF WARRANT PURCHASE PRICE
> AND NUMBER OF SHARES.  The Warrant Purchase Price
> shall be subject to decrease and the number of shares
> purchasable upon the exercise of this Warrant shall be subject
> to increase from time to time upon the occurrence of certain
> events and/or price determinations described in this Section 3.
> Upon each decrease of the Warrant Purchase Price per share
> of Common Stock, if any, the Holder of this Warrant shall
> thereafter be entitled to purchase, at the Warrant Purchase
> Price resulting from such adjustment, the number of Equity
> Units[5] obtained by multiplying the Warrant Purchase Price

---

[5]  The term "Equity Unit" was defined in the Warrant Agreements to include "Common Stock or Preferred Stock, either alone or issued, offered or sold together as an integrated investment unit with any warrants or similar non-debt securities convertible or exchangeable, directly or indirectly into Common Stock or Preferred Stock."  (Compl. ¶ 9).

per share of Common Stock in effect immediately prior to
such adjustment by the number of shares purchasable
pursuant hereto immediately prior to such adjustment, and
dividing the product thereof by the Warrant Purchase Price
per share of Common Stock resulting from such adjustment.

3.1  Issues of Equity Securities.  If and whenever during the
Pricing Period, [ACT] shall issue or agree to issue any Equity
Units or other securities, other than Excluded Units (as
defined below),[6] for a consideration per share or providing for
a conversion or an exercise price per share which is less than
the Warrant Purchase Price in effect immediately prior to
such issue, the Warrant Purchase Price shall be reduced to the
per-share price applicable to such issuance.  The fair market
value of each such share and security of which an Equity Unit
is comprised shall be determined by [ACT's] Board of
Directors in good faith; provided, that the Holders may appeal
any such determination to an Arbitrator as provided for
herein.  Each such adjustment of the Warrant Purchase Price
shall be calculated to the nearest one tenth of a cent....

(Compl. ¶ 8).  Accordingly, if before the plaintiffs exercised their warrants ACT issued or

agreed to issue any Equity Units or other securities at a price below $2.20 per share

during the Pricing Period, the price at which the plaintiffs could exercise their stock

purchase rights would decrease, and the number of purchasable shares would increase.

(Id. ¶ 11).

The Warrant Agreements also provided for adjustments to be made after the

_____

[6]  The Warrant Agreements defined "Excluded Units" as "shares of Common Stock or
options therefore issued to, exercised or purchased by directors, officers, employees or
consultants of [ACT] in connection with their service as directors of [ACT], their employment by
[ACT] or their retention as consultants of [ACT], in each case authorized by the Board of
Directors and issued pursuant to [ACT's] 2004 Stock Option Plans and 2005 Stock Incentive
Plans or any other such option plan approved by vote of a majority of the independent members
of the Board of Directors of [ACT]."  (Compl. ¶ 10).

plaintiffs exercised some or all of their purchase rights:

> If, at any time (and on each time) between May 1, 2005 and
> January 15, 2009 (the "Pricing Period"), after the exercise of
> any or all of the Warrants hereunder, [ACT] issues any Equity
> Units other than Excluded Units (as defined below), and the
> effective per share purchase price of Common Stock
> represented by such Equity Units (the "Effective Price")
> being issued is lower than the Warrant Purchase Price paid in
> connection with such prior exercise, then [ACT] shall issue to
> the Holder sufficient additional Equity Units (of the same
> security(ies) that was (were) previously issued to the Holder
> upon the previous exercise of the Warrant) such that the total
> number of Equity Units issued to the Holder equals the
> number determined by multiplying [the number of shares
> which the Holder is initially entitled to purchase] by a
> fraction, the numerator of which is $2.20 and the denominator
> of which is the Effective Price, as the same may be amended.

(Id. ¶ 12).  Therefore, even after the plaintiffs exercised their rights to purchase shares,

ACT was required to give them the best terms that it made available to other investors

who received ACT stock during the Pricing Period.  (Id. ¶ 13).

Other relevant provisions of the Warrant Agreements required ACT to notify

Aronson and Gorton whenever it issued any Equity Units or other securities to third

parties upon terms that triggered the plaintiffs' right to an adjustment, and provided for

equitable relief in the form a decree for specific performance or an injunction prohibiting

violations of the Warrant Agreements in the event ACT failed to comply with any of its

obligations thereunder.  (Id. ¶ 14).  Furthermore, under the parties' Settlement Agreement,

ACT agreed to pay any attorney's fees and costs incurred by the plaintiffs in connection

with the enforcement of the Warrant Agreements.  (Id.).  By their claims in this action,

Aronson and Gorton are seeking injunctive relief, attorney's fees and costs, in addition to damages, as a result of ACT's alleged failure to comply with the terms of the Warrant Agreements.

## The Woodward Warrant

The plaintiffs claim that during the Pricing Period, ACT issued warrants to purchase shares to two individuals that should have triggered the notice and adjustment provisions of their Warrant Agreements.  The first transaction, which allegedly occurred on September 15, 2005, involved the execution and delivery of a warrant to William Woodward, which entitled Woodward to purchase ACT stock at a price of $0.10 per share.  (Id. ¶ 18).  The plaintiffs claim that ACT breached the terms of their Warrant Agreements by failing to notify them of the existence of the Woodward Warrant, and by failing to make adjustments to their shares as a result of that transaction.  (Id. ¶ 19; G. Compl. ¶ 20).  The court previously determined, in its ruling on the defendants' motion to dismiss the plaintiffs' First Amended Complaints, that Aronson and Gorton had stated claims for breach of contract based on the issuance of the Woodward Warrant. Accordingly, ACT is not challenging those claims as part of its present motion to dismiss.

## The Colby Warrant

The second transaction at issue involved the issuance of a warrant to Deron Colby. Specifically, the plaintiffs allege that on or about October 4, 2005, during the Pricing Period, ACT executed and delivered a warrant to Deron Colby, which entitled Colby to

purchase ACT stock at a price of $0.25 per share.  (Compl. ¶ 23).  They further claim that ACT's failure to notify them about the existence of the Colby Warrant, and its failure to adjust the number and price of their shares based on the Colby Warrant, constituted a breach of the Warrant Agreements.  (Id. ¶ 24; G. Compl. ¶ 25).

The defendants contend that the Colby Warrant was issued on December 13, 2004, before the Pricing Period, rather than on October 4, 2005 as the plaintiffs' allege, and they have submitted a copy of a warrant agreement that is consistent with their position. The warrant, as submitted by the defendants, is dated "as of December 13, 2004" and purports to provide Colby with the right to purchase 75,000 shares of ACT common stock "at the purchase price of $0.25 per share[.]"  (Def. Ex. 3 at p. 2).[7]

In contrast, the plaintiffs have submitted a copy of a warrant agreement, which is not executed but is otherwise consistent with their claim that the Colby Warrant was issued during the Pricing Period.  That warrant is dated "as of October 4, 2005" and, like the warrant submitted by the defendants, purports to provide Colby with the right to purchase 75,000 shares of ACT common stock "at the purchase price of $0.25 per

---

[7] The plaintiffs argue that the court should not consider ACT's copy of the Colby Warrant because it has not been authenticated and because is it outside the Second Amended Complaints. This court finds that the plaintiffs' argument lacks merit.  As described above, the Colby Warrant is described in the Second Amended Complaints and is central to the plaintiffs' Second Claims for Relief.  Therefore, this court may consider the Colby Warrant without converting the defendant's motion to dismiss into one for summary judgment.  See Alt. Energy, Inc., 267 F.3d at 33. Furthermore, the defendant has filed a Declaration from its Controller and Custodian of Records attesting to the document's authenticity.  (See Def. Reply Mem. (Docket No. 79), Ex. 4). Accordingly, it appropriate for this court to consider the document in connection with the pending motion.

share[.]" (Pl. Ex. 3 at p. 1). Accordingly, it indicates that the Colby Warrant was issued during the Pricing Period and should have resulted in an adjustment of the plaintiffs' shares. As described below, each of the parties has presented arguments as to why the court should accept its version of the Colby Warrant. However, this court finds that the parties' arguments raise questions of fact that cannot be resolved on a motion to dismiss.

### The Andwell and Burrows Extensions

On or about August 25, 2006, the plaintiffs submitted Subscription Agreements to ACT pursuant to which they elected to purchase all of the shares of common stock that were covered by their Warrant Agreements. (Compl. ¶ 15; G. Compl. ¶ 16). The plaintiffs claim that after they exercised their purchase rights, ACT approved extensions of the exercise periods contained in warrants that had been issued to Andwell, LLC and to Nancy Burrows, the spouse of ACT's then acting Chief Executive Officer. (Compl. ¶ 28). They further claim that the extensions should have resulted in adjustments to their shares, and that ACT breached the Warrant Agreements by failing to notify them of the extensions and to provide the necessary adjustments. (Id. ¶ 30; G. Compl. ¶ 31).

The record demonstrates that ACT issued warrants to Andwell and Burrows in 2004, before the start of the Pricing Period, which authorized the warrant holders to purchase shares of ACT common stock at a price of $0.05 per share. (Pl. Ex. 5 at p. 1; Pl. Ex. 6 at p. 1). Pursuant to their warrant agreements, Burrows was authorized to exercise her purchase rights at any time during the period from September 30, 2004 to September 30, 2006, and Andwell was authorized to exercise its purchase rights at any

time during the period from November 26, 2004 to November 26, 2006.  (See id.).

Subsequently, however, ACT agreed to extend the exercise periods contained in the

Andwell and Burrows Warrants.  (Compl. ¶ 28).  As ACT allegedly reported:

> On November 26, 2004, in connection with the early release from
> escrow of funds related to our private equity financing, we granted to
> Andwell, LLC, a company affiliated with our Chief Executive
> Officer, William M. Caldwell, IV, warrants to purchase 250,000
> shares of our common stock at an exercise price of $0.05 per share.
> Effective as of December 8, 2006 and pursuant to unanimous
> approval of the Board of Directors, the exercise period was extended
> until December 31, 2010.  In connection with the extension of the
> exercise period, Mr. Caldwell and the Company entered into a
> certain lock-up agreement relating to such warrants which, subject to
> certain exceptions, prevents Mr. Caldwell from exercising his
> warrants until February 1, 2009.
>
> Effective as of December 8, 2006, the Company extended the exercise
> period of certain warrants to purchase an aggregate of 2000,000 shares
> of our common stock at an exercise price of $0.05 per share, held by Nancy
> Burrows, the present spouse of the Company's Chief Executive Officer,
> Mr. Caldwell.  Effective as of December 8, 2006 and pursuant to
> unanimous approval of the Board of Directors, the exercise period for these
> warrants was extended until December 31, 2010.  In connection with the
> extension of the exercise period, Ms. Burrows and the Company entered
> into a certain lock-up agreement relating to such warrants which, subject to
> certain exceptions, prevents Ms. Burrows from exercising her warrants until
> February 1, 2009.

(Id. (internal quotations omitted)).  The parties dispute whether the extension of the

exercise periods constituted the issuance of an Equity Unit under the plaintiffs' Warrant

Agreements.  As detailed below, this court concludes that the plaintiffs have stated a

claim for relief with respect to the extension of these warrants.

### Stock Sales to Outboard, Ice Cap and Tuxedo

Finally, the plaintiffs challenge ten transactions in which ACT allegedly sold stock to Outboard, Ice Cap and Tuxedo during the Pricing Period, in exchange for the cancellation of debt, at prices ranging from $0.002 to $0.0036 per share.  (Compl. ¶ 34). They claim that ACT's failure to notify them of these sales, as well as its failure to make adjustments to the number and price of their shares, amounted to a breach of ACT's obligations under the plaintiffs' Warrant Agreements.  (Id. ¶ 35; G. Compl. ¶ 36).  At issue is whether these claims must fail because the facts supporting them are based on allegations that were made against ACT by the SEC in a case pending in the District Court for the Middle District of Florida rather than on an independent inquiry by the plaintiffs in this case.  As detailed below, this court finds that while the pleadings are insufficient, the plaintiffs should be given an opportunity to amend their Complaints to add these claims.

Additional factual details relevant to this court's analysis are described below where appropriate.

### III.  ANALYSIS - ACT'S MOTION TO DISMISS

#### A.    Standard of Review

ACT has moved to dismiss the plaintiffs' Second, Third and Fourth Claims for Relief for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).  Motions to dismiss under Rule 12(b)(6) test the sufficiency of the pleadings.  Thus, when confronted with such a motion, the court accepts as true all well-pleaded facts and draws all reasonable

inferences in favor of the plaintiff.  Cooperman, 171 F.3d at 46.  Dismissal is only appropriate if the complaint, so viewed, fails to allege a "plausible entitlement to relief." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559, 127 S. Ct. 1955 1967, 167 L. Ed. 2d 929 (2007)).

Two underlying principles must guide the court's assessment as to the adequacy of the pleadings to support a claim for relief.  Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009).  "'First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' Such conclusory statements are 'not entitled to the assumption of truth.'"  Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)) (internal citations omitted).  "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss."  Id. (quoting Iqbal, 556 U.S. at 679, 129 S. Ct. at 1950).  "This second principle recognizes that the court's assessment of the pleadings is 'context-specific,' requiring 'the reviewing court to draw on its judicial experience and common sense.'  '[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] – that the pleader is entitled to relief.'"  Id. (quoting Iqbal, 556 U.S. at 679, 129 S. Ct. at 1950) (internal quotations and citation omitted; alterations in original).

### B.    Second Claims for Relief Relating to the Colby Warrant

ACT has moved to dismiss the plaintiffs' Second Claims for Relief on the grounds

that the Colby Warrant was issued before the Pricing Period and, therefore, did not

trigger the notice and adjustment provisions of the plaintiffs' Warrant Agreements.

Specifically, ACT argues that the Colby Warrant was issued in December 2004.  (Def.

Mem. (Docket No. 64) at 9).  Because the Pricing Period did not begin until May 1, 2005,

ACT contends that the plaintiffs cannot rely on the Colby Warrant to support a breach of

contract claim.  (See Def. Reply Mem. (Docket No. 79) at 2).  For the reasons that

follow, this court finds that there are questions of fact as to whether the Colby Warrant

was issued during the Pricing Period.  Therefore, this court recommends that ACT's

motion to dismiss these claims be denied.

        The relevant provisions of the Warrant Agreements required ACT to notify the

plaintiffs and make adjustments to their shares "[i]f and whenever during the Pricing

Period, [ACT] shall issue or agree to issue any Equity Units or other securities . . . for a

consideration per share or providing for . . . an exercise price per share which is less than

the Warrant Purchase Price in effect immediately prior to such issue[.]"  (Compl. ¶¶ 8,

14).  Thus, if ACT issued the Colby Warrant in December 2004, prior to the Pricing

Period, it had no obligation to comply with the notification and adjustment provisions of

the Warrant Agreements and could not have breached its contractual obligations to

Aronson and Gorton.  However, as described above, the plaintiffs have alleged that ACT

issued the Colby Warrant on or about October 4, 2005, during the Pricing Period.  (See

id. ¶ 23).  Moreover, they have submitted a copy of a warrant agreement, which purports

to grant Colby the right to purchase shares of ACT common stock for $0.25 per share,

and is dated "as of October 4, 2005[.]"  (Pl. Ex. 3 at p. 1).  Thus, the plaintiffs have stated a plausible claim for relief.

ACT nevertheless argues that the plaintiffs' copy of the Colby Warrant cannot support a claim for a relief because, unlike the December 2004 version submitted by the defendant, the 2005 document is unsigned.  (Def. Reply Mem. at 5).  However, the fact that the plaintiffs have submitted an unsigned document does not establish that no such Warrant was ever issued.  The plaintiffs should have an opportunity to explore the circumstances under which the 2005 Colby Warrant was created, and to resolve the apparent inconsistency between the two versions of the document based on a complete factual record.

The defendant also contends, based on documents that were submitted by the plaintiffs, that the 2005 Colby Warrant was prepared to replace the 2004 Colby Warrant, which was believed to have been lost.  (Def. Reply Mem. at 5-6).  It further argues that because the 2004 document was in fact not lost, and was relied on by Colby to exercise his purchase rights, the 2005 Colby Warrant was never executed and never issued to Colby.  (See id.).  However, as ACT concedes in its Reply memorandum, the materials on which it relies to support this argument are outside the Second Amended Complaints and are not integral to the plaintiffs' claims.  (Def. Reply Mem. at 4).  Therefore, they "cannot be considered in assessing ACT's motion to dismiss."  (Id.).  Thus, while there is nothing preventing ACT from raising this argument again after the parties have had an opportunity to develop the factual record, this court finds that it is premature and does not

17

warrant dismissal of the Second Claims for Relief.[8]

**C.**     **Third Claims for Relief Relating to the Andwell**
          **and Burrows Extensions**

By their Third Claims for Relief, Aronson and Gorton allege that ACT breached

the Warrant Agreements by extending the exercise periods contained in the Andwell and

Burrows Warrants without notifying the plaintiffs of the extensions or making

adjustments to the plaintiffs' shares.  ACT contends that these claims should be dismissed

because there is no support for the plaintiffs' claim that ACT's decision to extend the

exercise periods constituted the "issuance" of Equity Units that would have  triggered the

notification and adjustment requirements of the Warrant Agreements.  (Def. Mem. at 9-

10).  This court disagrees, and recommends that the motion to dismiss the Third Claims

for Relief be denied.

The question raised by the defendant's motion to dismiss the Third Claims for

Relief is whether, by extending the exercise periods contained in the Andwell and

Burrows Warrants, ACT "issue[d]" Equity Units within the meaning of the Warrant

Agreements.  (See Compl. ¶ 12).  This court previously addressed the definition of

"issue," as used in the plaintiffs' Warrant Agreements, in its Report and Recommendation

---

[8] This court notes further that the plaintiffs have submitted materials in support of their
contention that the Colby warrant was issued on October 4, 2005, which include a list entitled
"2005 Warrants." (Pl. Ex. 1).  This document, which was allegedly obtained from ACT prior to
the filing of this action, lists the warrant as having been received by Colby on October 4, 2005.
(See Pl. Opp. Mem. at 6; Pl. Ex. 1).  The document, like a number of the other documents
submitted by the plaintiffs, is not appropriately considered in connection with the motion to
dismiss.  It does, however, highlight the need for further development of the record.

on the defendants' motion to dismiss Aronson's and Gorton's First Amended Complaints.

As this court ruled:

> "[T]he interpretation of a contract is a question of law for the courts." LeBlanc v. Friedman, 438 Mass. 592, 596, 781 N.E. 2d 1283, 1287 (2003).  Under ordinary principles of contract interpretation, the court "must interpret the words in a contract according to their plain meaning" in order to "determine the objective intent of the parties in making the contract." Polito v. Sch. Comm. of Peabody, 69 Mass. App. Ct. 393, 396, 868 N.E. 2d 624, 626-27 (2007) (quotations and citation omitted).  Accordingly, the court "must put [itself] in the place of the parties to the instrument and give its words their plain and ordinary meaning in the light of the circumstances and in view of the subject matter." Polito, 69 Mass. App. Ct. at 396, 868 N.E. 2d at 627 (quotations and citations omitted).  The court may consider a word's accepted dictionary definition in order to determine its ordinary meaning. See N. Am. Site Developers, Inc. v. MRP Site Dev., Inc., 63 Mass. App. Ct. 529, 534. 827 N.E. 2d 251, 255 (2005) (relying on dictionary to determine word's plain and ordinary meaning).
>
> The Warrant Agreements do not define the word "issue," and they contain nothing to suggest that the word was intended to carry any unusual meaning.  As it pertains to the issuance of stock, the word "issue" is commonly understood to mean "[t]o send out or distribute officially." Black's Law Dictionary at 908 (9th ed. 2009).

(R&R (Docket No. 47) at 24-25 (footnotes omitted)).  Accordingly, this court determined that ACT's issuance of Equity Units or other securities occurred when it executed and delivered a warrant to the holder so that the holder was able to exercise his or her rights to purchase ACT stock in accordance with the terms of the warrant.[9]  (See id. at 25).

---

[9] This court's determination that Equity Units were "issued" when ACT executed and delivered a warrant to the holder is consistent with the plaintiffs' claims with respect to the Woodward and Colby Warrants.  As described above, those claims are premised on allegations that ACT executed and delivered warrants to Woodward and Colby during the course of the

The plaintiffs have not alleged that ACT executed or delivered the original Andwell and Burrows Warrants at any time during the Pricing Period. (See Compl. ¶¶ 27-32). In fact, the record shows that the Burrows Warrant was granted on or about September 30, 2004, and that the Andwell Warrant was granted on or about November 26, 2004. (See id. ¶ 28; Pl. Ex. 5 at p. 1; Pl. Ex. 6 at p. 1). Accordingly, the record indicates that the Warrants originally were "issued" within the meaning of the Warrant Agreements prior to the start of the Pricing Period.

Nevertheless, the record establishes that on December 8, 2006, after the two year exercise period for the Andwell and Burrows Warrants had expired, ACT extended the warrants so that they would be in effect until December 2010, although they could not be exercised until February 1, 2009, after the expiration of the Pricing Period. (See id.).[10] The plaintiffs contend that, in substance, ACT's decision to extend those exercise periods through December 2010, after the holders' right to purchase shares had lapsed, constituted the issuance of "new and materially different options to its insiders[,]" which should have triggered the notice and adjustment requirements contained in the plaintiffs' Warrant Agreements. (See Pl. Opp. Mem. at 11-12). This court agrees. Since the original Andwell and Burrows Warrants had expired by the time of the "extensions," in

---

Pricing Period. (Compl. ¶¶ 19-20, 24-25).

   [10] While the dates when the original Andwell and Burrows Warrants expired were not pleaded in the Second Amended Complaints, they are apparent from the Warrants themselves, which the plaintiffs submitted in support of their opposition to the motion to dismiss. As noted above, the Warrants are appropriately considered in connection with the motion to dismiss.

reality ACT was issuing Andwell and Burrows new warrants during the Pricing Period.[11]

This conclusion is consistent with this court's interpretation of the term "issue" as used in the plaintiffs' Warrant Agreements.  By executing and delivering the so-called "extension" of the expired warrants to Andwell and Burrows, Act was executing and delivering a warrant to the holder so that the holder was able to exercise his or her rights to purchase ACT stock in accordance with the terms of the warrant.  (See R&R (Docket No. 47) at 26).  If the so-called extensions had not been issued, Andwell and Burrows would have not had any warrants as of December 8, 2006.  Accordingly, the plaintiffs have established that the alleged extensions of the exercise periods in the Andwell and Burrows Warrants constituted an issuance of warrants during the Pricing Period.

Finally, ACT argues that the extension could not be considered the issuance of an Equity Unit during the Pricing Period because, by the extension's terms, the warrants could not be exercised until February 1, 2009, after the expiration of the Pricing Period. (Def. Mem. at 11).  However, under the terms of the plaintiffs' Warrant Agreements, the

---

[11]  ACT challenges the plaintiffs' statement that "what ACT calls an extension actually is a novation – that is a new contract between the company and the warrant holder, based on the newly stated option term."  (Pl. Opp. Mem. at 11).  Thus, relying on the Restatement (Second) of Contracts § 280, ACT argues that "[a] novation is 'a type of substituted contract that has the effect of adding a party, either as obligor or obligee, who was not a party to the original duty.'" (ACT Reply Mem. at 7 (quoting Restatement)).  However, it appears from the plaintiffs' memorandum, in which they explained "novation" without any citation, that they were giving the word "novation" its colloquial meaning.  See Black's Law Dictionary at 1168 (9th ed. 2009) (defining novation as "[t]he act of substituting for an old obligation a new one that either replaces an existing obligation with a new obligation or replaces an original party with a new party."). Since Andwell's and Burrows' Warrants were no longer in effect on December 8, 2006, the purported "extension" on that date created new agreements between the parties.

21

exercise date of the warrants is not relevant to whether the warrants had to be disclosed to the plaintiffs.  In sum, the plaintiffs have stated a claim for relief based on the extension of the Andwell and Burrows Warrants.

### D.  Fourth Claims for Relief Relating to Sales of Stock to Outboard, Ice Cap and Tuxedo

By their Fourth Claims for Relief, Aronson and Gorton allege that during the Pricing Period, ACT engaged in ten transactions in which it sold stock to Outboard, Ice Cap and Tuxedo, in exchange for the cancellation of debt, at prices which should have triggered the notice and adjustment provisions of the plaintiffs' Warrant Agreements. (See Compl. ¶ 34).  They further allege that ACT breached the Warrant Agreements by failing to notify them of the sales or to make the necessary adjustments to their shares. (Id. ¶ 35; G. Compl. ¶ 36).  The defendant has moved to dismiss these claims because they are predicated on allegations made by the SEC in an unrelated case rather than on the plaintiffs' own investigation of the facts.   (Def. Mem. at 12-13).  While this court agrees that these claims are improperly pled, this court finds that the pleading deficiency can be easily remedied.  Therefore, this court recommends that the motion to dismiss be allowed with respect to the Fourth Claims for Relief, but that the plaintiffs have a brief opportunity to amend those claims.

There is no dispute that as currently pled, the factual allegations supporting the plaintiffs' Fourth Claims for Relief are adopted from allegations made by the SEC in an entirely separate action.  Specifically, Aronson and Gorton allege as follows with respect

to the sales of stock to Outboard, Ice Cap and Tuxedo:

> Based on allegations made against ACT by the Securities Exchange Commission in the action entitled *SEC v. Leftkowitz*, Case n. 12cv01210, now pending in the United States District Court for the Middle District of Florida, ACT sold stock in ten transactions, in exchange for cancellation of debt, during the Pricing Period (the "Outbound (sic), Ice Cap and Tuxedo Sales") as follows:

(Compl. ¶ 34).  What follows is a chart listing the transactions at issue, including but not limited to, the value of the past debt due to Outboard, Ice Cap and Tuxedo, the number of settlement shares issued and the price per share.  (Id.).  There are no other factual allegations supporting the Fourth Claims for Relief.  (See id. ¶¶ 33-37).  Thus, by their own representation, the plaintiffs have based their claims on unproven allegations asserted by the SEC in unrelated case.

"A pleading may not adopt other pleadings from a wholly separate action." Constellation Energy Commodities Group, Inc. v. Transfield ER Cape Ltd., 801 F. Supp.2d 211, 223 (S.D.N.Y. 2011).  See also Texas Water Supply Corp. v. Reconstruction Fin. Corp., 204 F.2d 190, 196 (5th Cir. 1953) (noting that Fed. R. Civ. P. 10(c) "permits references to pleadings and exhibits in the same case, but there is no rule permitting the adoption of a cross-claim in a separate action in a different court by mere reference"); 5A Charles Allan Wright & Arthur R. Miller, Federal Practice & Procedure § 1326, at 757-58 (3d ed. 2011) ("it has been held that allegations in pleadings in another action, even if between the same parties, cannot be incorporated by reference").  Accordingly, the plaintiffs' incorporation of allegations from another case cannot support

a claim for relief.

The cases relied on by the plaintiffs' do not hold otherwise.  Thus, in <u>United States v. Int'l Longshoremen's Ass'n</u>, 518 F. Supp. 2d 422 (E.D.N.Y. 2007), the court rejected the Government's effort to state claims by incorporating into its complaint factual allegations contained in pleadings from other actions.  <u>See</u> <u>id.</u> at 464-65.  In connection with its decision, the court noted that under Fed. R. Civ. P. 10(c), "[s]tatements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion."  <u>Id.</u> at 465 (quoting Fed. R. Civ. P. 10(c)).  It also acknowledged the existence of case law suggesting that the reference to  "'prior pleadings' in Rule 10(c) is limited to prior pleadings in the same action," and does not include pleadings in prior actions even if those actions involved the same parties.  <u>Id.</u>  However, the court expressly declined to resolve the question whether under Rule 10(c), it was appropriate for the Government to plead essential elements of its claims by incorporating allegations from separate civil and criminal actions.  <u>See</u> <u>id.</u> at 464-65.  Instead, the court found that "even if pleading a claim by incorporating matter from a pleading in a previous case is not categorically prohibited by the Federal Rules of Civil Procedure, the Government's attempt to do so in this case runs afoul of Rule 8(a)(2)."  <u>Id.</u>  Accordingly, nothing in that court's ruling undermines this court's conclusion that the Fourth Claims for Relief, as presently alleged, fail to state a claim.

The plaintiffs' reliance on <u>Cooper v. Nationwide Mut. Ins. Co.</u>, No. Civ. A. 02-2138, 2002 WL 31478874 (E.D. Pa. Nov. 7, 2002) fares no better.  In that case, the court

held that under Fed. R. Civ. P. 10(c), it was proper for the plaintiff to incorporate allegations and claims from his own state court complaint into his complaint in federal court.  Cooper, 2002 WL 31478874, at *5.  However, the court did not address the question whether it would have been appropriate for the plaintiff to incorporate allegations made by another party in an entirely separate action.  See id.  As described above, authorities that have addressed that question have answered it in the negative. Therefore, the plaintiffs' efforts to state a claim by incorporating allegations made by the SEC in Leftkowitz must fail.

Although the Fourth Claims for Relief cannot be sustained in their present form, the plaintiffs have shown that the deficiency in their pleading could be easily remedied. In connection with their opposition to ACT's motion for sanctions, the plaintiffs submitted a chart, which they had obtained from ACT in a prior litigation and which depicts much of the information set forth in the SEC's allegations, including the number of shares of stock that were sold to Outboard, Ice Cap and Tuxedo, the cost of the stock, and the "Stock Issuance Letter Date."  (See Pl. Opp. re Sanctions  (Docket No. 80), Ex. C).  Moreover, the plaintiffs submitted excerpts from the deposition of ACT's former Chief Executive Officer, William MacKay Caldwell ("Caldwell"), in which Caldwell explained that the chart shows a listing of stock that was issued by ACT in order to resolve debt that was owed to Outboard, Ice Cap and Tuxedo.  (Id., Ex. B at 110). Therefore, the plaintiffs apparently have evidence to support claims relating to the alleged sales of stock to Outboard, Ice Cap and Tuxedo, and should be given the opportunity to

amend their pleading based on the information they have.

ACT argues that the evidence which Aronson and Gorton submitted in connection with their opposition to the motion for sanctions provides no support for a claim because it "does not show that ACT sold stock for less than $2.20 per share during the Pricing Period." (Def. Reply re Sanctions (Docket No. 86) at 10). This does not appear to be correct since when the total amounts paid for the stock listed on the chart are divided by the number of shares purchased, they yield at least some per share prices below $2.20 per share. (See Pl. Opp. re Sanctions, Ex. C). In any event, the record is clear that the plaintiffs have demonstrated that they have an independent evidentiary basis for asserting claims based on the alleged sales of stock to Outboard, Ice Cap and Tuxedo. This court recommends that they be given a brief period from the court's final ruling on the motion to dismiss to amend their Second Amended Complaints in order to state such claims.

## IV.  ANALYSIS – ACT'S MOTION FOR SANCTIONS

ACT has also moved for sanctions against Aronson and Gorton, pursuant to Fed. R. Civ. P. 11, on the grounds that the Second, Third and Fourth Claims for Relief have no reasonable or good faith basis in law or in fact. It requests that the court award it reasonable attorneys' fees and costs  incurred in defending against these claims, as well as any other sanctions that may be appropriate under the circumstances. Because this court finds that the plaintiffs had a reasonable and good faith basis for their claims, and that those claims are not frivolous, the defendant's motion for sanctions is denied.

"Rule 11 permits a court to impose sanctions on a party or lawyer for advocating a

frivolous position, pursuing an unfounded claim, or filing a lawsuit for some improper purpose." CQ Int'l Co., Inc. v. Rochem Int'l, Inc. USA, 659 F.3d 53, 60 (1st Cir. 2011). A claim is considered frivolous where it is "either not well-grounded in fact or unwarranted by existing law or a good faith argument for an extension, modification or reversal of existing law." Cruz v. Savage, 896 F.2d 626, 632 (1st Cir. 1990). However, "it is clear that '[t]he mere fact that a claim ultimately proves unavailing, without more, cannot support the imposition of Rule 11 sanctions.'" CQ Int'l Co., Inc., 659 F.3d at 60 (quoting Protective Life Ins. Co. v. Dignity Viatical Settlement Partners, L.P., 171 F.3d 52, 58 (1st Cir. 1999)). Moreover, "a showing of at least culpable carelessness is required before a violation of the Rule can be found." Id. (quoting Citibank Global Mkts., Inc. v. Santana, 573 F.3d 17, 32 (1st Cir. 2009)).

ACT maintains that the plaintiffs' Second Claims for Relief have no evidentiary support because the allegation that the Colby Warrant was issued on or about October 4, 2005 is contradicted by the plain text of the Colby Warrant, which demonstrates that it was issued on December 13, 2004. (Def. Mem. re Sanctions (Docket No. 70) at 5). However, as discussed above, the plaintiffs have produced a copy of the Colby Warrant which is consistent with their allegations. Additionally, in connection with their opposition to the motion to dismiss, the plaintiffs submitted a list entitled "2005 Warrants," which they claim to have obtained from ACT prior to the filing of this action. (See Pl. Opp. Mem. at 6; Pl. Ex. 1). The list contains information indicating that, according to ACT's own records, Deron Colby received a warrant on October 4, 2005 to

27

purchase 75,000 shares of stock at a price of $0.25 per share.  (Pl. Ex. 1).  Accordingly, this court finds that Aronson and Gorton have presented a factual basis for their claim that ACT issued the Colby Warrant during the Pricing Period.[12]

The defendant also argues that the plaintiffs' Third Claims for Relief are frivolous because their theory that ACT "issued" Equity Units by extending the exercise periods contained in the Andwell and Burrows Warrants is entirely at odds with the court's prior interpretation of the word "issue" as used in the plaintiffs' Warrant Agreements.  (Def. Mem. re Sanctions at 6-7).  Thus, ACT contends that at the time the plaintiffs filed their Second Amended Complaints, they had no reasonable basis for asserting such claims under the existing law of this case.  (See id. at 7).  Again this court disagrees.  As detailed above, in light of the fact that the warrants had expired prior to the issuance of the alleged "extension," the execution and delivery of the extension can appropriately be considered the issuance of Equity Units.  The allegations of the Second Amended Complaints with respect to the Andwell and Burrows Warrants is consistent with the courts' earlier

---

[12] The parties dispute whether additional evidence submitted by the plaintiffs, including but not limited to, excerpts from Colby's deposition in an earlier litigation, actually provide support for their assertion that they had a reasonable basis for filing a claim based on the issuance of the Colby Warrant.  (See Pl. Opp. re Sanctions at 5-6; Def. Reply re Sanctions at 2-6).  This court finds that it is unnecessary to resolve this dispute in order to decide the motion for sanctions. Because the 2005 version of the Colby Warrant and the list of 2005 Warrants raise, at a minimum, questions of fact as to whether the Colby Warrant was issued during the Pricing Period, the plaintiffs have established a reasonable basis for asserting their Second Claims for Relief.  To the extent discovery reveals that ACT never actually issued a warrant to Colby in 2005, the plaintiffs should reevaluate whether it is appropriate to continue to pursue those claims.  See Cruz v. Savage, 896 F.2d 626, 630 (1st Cir. 1990) (explaining that under Rule 11, "attorneys are ... under a continuing obligation to ensure that the proceedings do not continue without a reasonable basis in law and fact").

interpretation of the term "issue."

This court also rejects the defendant's assertion that sanctions are warranted because the plaintiffs failed to investigate the alleged sales of stock to Outboard, Ice Cap and Tuxedo, and relied instead on allegations made by the SEC in an unrelated lawsuit. (See Def. Mem. re Sanctions at 8-9).  "Whether a litigant breaches his or her duty [under Rule 11] to conduct a reasonable inquiry into the facts and the law depends on the objective reasonableness of the litigant's conduct under the totality of the circumstances." CQ Int'l Co., Inc., 659 F.3d at 62 (quoting Lichtenstein v. Consol. Servs. Group, Inc., 173 F.3d 17, 23 (1st Cir. 1999)).  Based on the totality of the circumstances presented here, this court concludes that the plaintiffs did not breach their duty to perform a reasonable inquiry.

As described above, it is undisputed that the plaintiffs based their Fourth Claims for Relief on allegations made by the SEC in the matter of SEC v. Leftkowitz pending in the Middle District of Florida.  Such reliance does not warrant the imposition of sanctions.  As an initial matter, it was not frivolous for the plaintiffs to consider the SEC a reliable source concerning the company's issuance of stock, at least at the initial pleading stages of a case based on ACT's alleged failure to disclose information it was obligated to disclose.  Moreover, as the plaintiffs argue, they have additional support for their claims.[13]  During a prior litigation with the plaintiffs, ACT produced a chart

---

[13]  ACT contends that the plaintiffs did not rely on such additional information when they drafted their Second Amended Complaints, and that the plaintiffs' more recent discovery of

containing much of the same information as the information alleged by the SEC in the

Leftkowitz matter, including factual support for the plaintiffs' claims that ACT sold stock

to Outboard, Ice Cap and Tuxedo during the Pricing Period at prices that should have

triggered adjustments under their Warrant Agreements.  (See Pl. Opp. re Sanctions at 8 &

Ex. C). Therefore, the plaintiffs have shown that they have a reasonable factual basis for

asserting their Fourth Claims for Relief notwithstanding the defect in their pleading.

For all these reasons, the defendant's motion for sanctions pursuant to Rule 11 is denied.

## V.  CONCLUSION

For all the reasons described herein, this court recommends to the District Judge to

whom this case is assigned that "Advanced Cell Technology's Partial Motion to Dismiss

Plaintiffs' Second Amended Complaints" (Docket No. 63) be ALLOWED IN PART and

DENIED IN PART.  Specifically, this court recommends that the plaintiffs' Fourth

Claims for Relief be dismissed, but that the motion to dismiss the Second and Third

Claims for Relief be denied.  Furthermore, because this court finds that the pleading

defect concerning the sales to Outboard, Ice Cap and Tuxedo can be easily remedied, this

court recommends that the dismissal be without prejudice, and that the plaintiffs have an

---

evidence from the earlier litigation constitutes nothing more than a post hoc attempt to avoid the
imposition of sanctions.  (Def. Reply re Sanctions at 9-10).  However, this argument does not
support sanctions in this case.  The fact remains that the plaintiffs have shown that they have an
independent basis for asserting such claims.  Moreover, it certainly was not frivolous for the
plaintiffs to rely on the SEC complaint.  "Sanctions under Rule 11 . . . should not be imposed so
as to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories."  Cruz, 896
F.2d at 631 (quotations and citation omitted).  Furthermore, this court will not penalize the
plaintiffs for pursuing a claim that was not so obviously groundless as to amount to "culpable
carelessness."  CQ Int'l Co., Inc., 659 F. 3d at 60 (quotations and citation omitted).

opportunity to amend their Fourth Claims for Relief promptly after the court's final ruling on the motion to dismiss.[14]

In light of this court's conclusion that the plaintiffs had a reasonable basis for asserting their claims, and that the claims are not frivolous, "ACT's Motion for Sanctions Against Plaintiffs" (Docket No. 69) is DENIED.

    / s / Judith Gail Dein    
Judith Gail Dein
United States Magistrate Judge

---

[14] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).